637 So.2d 694 (1994)
STATE of Louisiana
v.
Shane TRAHAN.
No. 93 KA 1116.
Court of Appeal of Louisiana, First Circuit.
May 20, 1994.
*697 Stephen E. Caillouet, Thibodaux, for plaintiff-appellee State of La.
Alexander L. Doyle, Houma, for defendant-appellant Shane Trahan.
Before WATKINS, SHORTESS and FOGG, JJ.
WATKINS, Judge.
Shane Trahan was indicted with three counts of vehicular homicide, violations of LSA-R.S. 14:32.1. He pled not guilty and, after trial by jury, was convicted as charged. On each count, the court sentenced him to serve a term of ten years imprisonment at hard labor and to pay a fine of $2,000 and court costs. The court imposed the sentences concurrently and credited defendant with time served. Defendant has appealed, urging eleven assignments of error. Assignment numbers 1-4 and 6-7 were not briefed on appeal and, therefore, are considered abandoned. See Uniform RulesCourts of Appeal, Rule 2-12.4.

FACTS
The following facts were revealed at trial. At about 2:30 a.m. on June 16, 1991, Page Comeaux was driving a Buick LeSabre south on Highway 308 in Lafourche Parish. Accompanying her were Jessica Lee (in the middle of the front seat) and Kendalyn Cheramie (on the passenger side of the front seat). As the young women were talking, they saw headlights coming toward them and noticed that an oncoming northbound vehicle had gone off the road onto the shoulder. According to Ms. Cheramie, the vehicle went off the road on its right side, returned to the highway and crossed the centerline, went off the other side of the road, and then returned to the highway and struck the car driven by Ms. Comeaux. Although Ms. Comeaux took evasive actions, she was unable to avoid the accident. As a result of the accident, Ms. Comeaux died instantly and Ms. Lee died about an hour later. Ms. Cheramie survived the accident but suffered serious injuries.
Trooper Gregg Falgout with the Louisiana State Police arrived at the accident scene minutes later. Upon arrival, he saw the Buick LeSabre on fire on the southbound shoulder facing south. The Buick had sustained damage on the driver's side of the front of the vehicle. Another vehicle, a Mazda truck, was facing north on the northbound shoulder with the front of the truck up against a telephone pole. The damage to the truck was on the passenger's side of the front of the truck. Ms. Cheramie and Ms. Lee had already been pulled from the Buick; Trooper Falgout assisted others in trying to remove Ms. Comeaux from the burning car. Trooper Falgout determined that defendant and Petey Mejia had been the occupants of the truck. Defendant was lying about eleven feet from the Buick[1]; Mr. Mejia, with his arm severed, was 111 feet northwest of the Buick. Mr. Mejia's arm was located on the ground about three feet from defendant near the rear quarter panel of the side of the Buick. According to the autopsy report, Mr. Mejia died about six hours after the accident as a result of his injuries.
Sgt. Ralph Mitchell, a fatality/homicide traffic accident investigator with the Louisiana State Police, was accepted by the court as an expert in the field of accident reconstruction. He arrived at the scene shortly after Trooper Falgout and assisted in the investigation. After viewing physical debris and marks on the roadway, Sgt. Mitchell and Trooper Falgout determined that the truck had been traveling northbound when it went completely off the highway in a curve and traveled about 140 or 180 feet on the shoulder.[2] *698 The truck then returned to the roadway, crossed over the centerline, and hit the Buick in the southbound lane approximately 43 feet from the point where the truck reentered the roadway. Sgt. Mitchell explained that the change in the surfaces (from shoulder to highway) and the tendency of people to oversteer to correct a problem resulted in the truck's being steered at a sharp angle across the roadway after it returned to the road, where it then struck the Buick at an angle. Sgt. Mitchell opined that after the impact, the truck started spinning counterclockwise and spun around twice before coming to rest. As a result of the accident, the occupants of the truck were thrown from the vehicle. The Buick rotated counterclockwise before it stopped moving.
The state introduced additional evidence to prove that defendant was operating the truck at the time of the accident and to prove that defendant was under the influence of alcoholic beverages and had a blood alcohol concentration of 0.10 percent or more. Those facts will be discussed in detail in connection with our treatment of assignment of error number ten, wherein defendant contests the state's proof of those elements.

INSUFFICIENT EVIDENCE
Because the facts discussed in connection with this assignment are relevant to other issues raised in this appeal, we elect to treat this assignment first. In this assignment of error (number ten), defendant argues the evidence was insufficient. He specifically claims the state's circumstantial evidence did not exclude the reasonable hypothesis that Petey Mejia was driving the Mazda truck. Defendant also claims the evidence did not establish that defendant's blood alcohol concentration combined with his operation of the truck to cause the victims' deaths.
In reviewing claims challenging the sufficiency of the evidence, this Court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). See also LSA-C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988). In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, i.e., "assuming every fact to be proved that the evidence tends to prove," every reasonable hypothesis of innocence is excluded. LSA-R.S. 15:438. See State v. Northern, 597 So.2d 48, 50 (La.App. 1st Cir. 1992).
When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Jacobs, 504 So.2d 817, 820 (La.1987). See also Northern, 597 So.2d at 51. In Jacobs, the Louisiana Supreme Court explained the obligation of the reviewing court when examining the sufficiency of circumstantial evidence:
When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. An evaluation of the reasonableness of other hypotheses of innocence provides a helpful methodology for determining the existence of a reasonable doubt. The reviewing court does not simply determine whether there is another possible hypothesis which could explain the events in a exculpatory fashion. Rather, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether any alternative hypothesis is sufficiently reasonable *699 that a rational juror could not have found proof of guilt beyond a reasonable doubt.
504 So.2d at 821 n. 6.
Vehicular homicide is defined as follows:
A. Vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, vessel, or other means of conveyance whether or not the offender had the intent to cause death or great bodily harm whenever any of the following conditions exist:
(1) The offender is under the influence of alcoholic beverages as determined by chemical tests administered under the provisions of R.S. 32:662.
(2) The offender's blood alcohol concentration is 0.10 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood.
(3) The offender is under the influence of narcotic drugs, central nervous system stimulants, hallucinogenic drugs, methaqualone, or barbiturates and such condition was a contributing factor to the killing.
LSA-R.S. 14:32.1 A (prior to its amendment by 1993 La.Acts, No. 415, § 1).
On appeal, defendant does not dispute that the victims died as a result of injuries sustained during the accident or that defendant was under the influence of alcoholic beverages and had a blood alcohol concentration of 0.10 percent or more. However, defendant specifically challenges the sufficiency of the state's proof that he was the operator of the truck. He claims Petey Mejia was driving the truck at the time of the accident. As the vehicular homicide statute indicates, the state is required to prove that defendant was the operator or had actual physical control of the truck.
In its opening statement, the state conceded that it had no direct evidence that defendant was driving the truck at the time of the accident. However, extensive circumstantial evidence was introduced which established that defendant was the driver of the truck. He was the registered owner of the truck, having purchased it two months prior to the accident. The truck had a standard transmission. According to Mr. Mejia's brother, Mr. Mejia could not drive a standard transmission vehicle as he did not have the patience to learn when some friends tried to teach him.
Witnesses had seen defendant driving the truck and Mr. Mejia riding as a passenger. Mr. Mejia's brother, John Mejia, testified that defendant went to the Mejia's house for a barbecue on the day before the accident. John Mejia recalled defendant's leaving twice to get more beer. Defendant was driving the truck when Petey Mejia accompanied him on one of the trips. Later, when defendant and Petey Mejia went out together for the evening, defendant again drove the truck. Defendant testified that he drove his truck from Petey Mejia's house to Mary's Lounge, from Mary's Lounge to Peanut's Lounge, and from Peanut's Lounge to the Boat Shed Lounge. Although defendant could not recall leaving the Boat Shed Lounge, a woman who saw defendant and Mr. Mejia leaving the Boat Shed Lounge testified that, after the bar closed, she saw defendant and Mr. Mejia walk toward defendant's truck. When she glanced over to look at the truck, she noticed that Mr. Mejia was on the passenger side. The accident occurred not too long after defendant and Mr. Mejia left the Boat Shed Lounge.
After the accident, defendant was transported to the hospital in the same ambulance with Kendalyn Cheramie, the lone survivor of the other vehicle. Ms. Cheramie recalled that in the ambulance defendant repeatedly said that "he couldn't believe that he had did that to his f________ truck." She also testified that, upon arrival at the hospital, defendant started screaming and asking about his friend, Petey Mejia. Defendant repeatedly made statements such as, "My truck. My f________ truck. I can't believe I did this. He did it to my truck." Because of defendant's comments, Ms. Cheramie asked to be put in another room. The emergency room nurse remembered defendant making similar statements. She testified that several times defendant would close his eyes as if he were going to lose consciousness. Then he would regain consciousness and say, "I want to get out of here and go tend to my f________ *700 truck. I can't believe that I messed it up." At the trial, defendant did not recall making these statements; he claimed Ms. Cheramie and the nurse were prejudiced against him. However, he admitted it was possible that he had said, "I can't believe I did that."
When Trooper Gregg Falgout surveyed the truck at the scene of the accident, he found that the damage to the truck was on the right front corner from the center of the hood to the passenger side and on the right front fender area. Sgt. Mitchell was qualified as an accident reconstruction expert. Sgt. Mitchell had arrived at the scene shortly after Trooper Falgout. He viewed the scene of the accident, took measurements, noted the debris left on the roadway, examined the damage to the vehicles, and reviewed the medical records of defendant and the autopsy report on Mr. Mejia. Sgt. Mitchell testified that, upon impact, the truck began to spin counterclockwise. However, because the occupants of the truck were unrestrained by seatbelts, they continued to move in the same direction in which the truck had been traveling before the accident. Thus, their bodies in continuing to go forward would have gone to the right side of the truck. As a result of his investigation, Sgt. Mitchell concluded that he would expect the driver of the truck to have sustained relatively minor, nonfatal injuries compared to the injuries the passenger would have sustained. He explained that there was very little damage to the driver's side of the truck. Because some of the controls under the steering wheel were pushed from left to right during the accident, he said he would expect the driver to have injuries to his left hip or thigh and to his lower right leg, right ankle, or knee. Sgt. Mitchell opined that the passenger would have sustained injuries to the right side of his body, from about the middle of his chest and up. He explained that the passenger door was bowed out, having been pushed from the inside to the outside of the truck. Had the other vehicle caused that damage, the door would have been pushed in. Sgt. Mitchell determined the passenger of the truck pushed the door before being thrown out of the truck. At the point of impact, the greatest force occurred, sufficient to propel the passenger a great distance. Because Mr. Mejia weighed 200 pounds and was found over one hundred feet from the accident site, Sgt. Mitchell concluded he was the passenger. When asked if it was possible for the occupants of the truck to have changed positions during the accident, Sgt. Mitchell testified that, because tissue and blood were found on the side of the Buick with Mr. Mejia's arm close by, it was apparent that Mr. Mejia lost his arm very close to the time when the two vehicles hit. If someone had been between Mr. Mejia and the door, the person would have sustained injuries even more severe than those Mr. Mejia suffered because they would have been crushed between Mr. Mejia and the door.[3]
Sgt. Mitchell's conclusions were supported by the description of Mr. Mejia's injuries given by Dr. Andrew H. Hoffman, III, the doctor who performed the autopsy on Mr. Mejia. Dr. Hoffman testified that Mr. Mejia suffered severe injuries on the right side of his body. Most noticeably, his right arm was missing, having been torn off at the elbow. He had tremendous swelling on the right shoulder, right side of the neck, and front part of the right side of the chest. His collarbone was dislocated, and the three top ribs on his right side were broken. He had tremendous internal bleeding in the neck and under the muscles of the chest wall under his right arm. He also had abrasions on the right chest and right knee and a laceration on the right side of his forehead. The injuries on the left side of his body were merely minor abrasions. The doctor concluded that Mr. Mejia must have suffered a serious impact to the right side of his body.
Defendant's medical records revealed that he sustained injuries such as those Sgt. Mitchell would have expected to see on the driver. According to the doctor who prepared the discharge summary, upon arrival at the hospital defendant had an unstable right knee, a swollen right ankle, a fractured left thigh with an open wound, and complaints of severe thigh pain. After surgery *701 on the thigh, defendant recovered and was released on June 28, 1991. According to defendant, in addition to having surgery on his left leg, his right leg was put in a cast and his knee was severely damaged. Additionally, he had to wear a neck brace and he experienced pain in his left arm, shoulder, and neck. He also had bruising on his neck and head, glass in his left hand, and a laceration on his ear.
By his own testimony, defendant advanced the hypothesis of innocence that Petey Mejia was driving the truck at the time of the accident. Although defendant admitted driving to the Boat Shed Lounge, he claimed he could not remember leaving the Boat Shed Lounge and that his next recollection was of Mr. Mejia's driving the truck as they crossed the bridge. He testified that Mr. Mejia drove the truck to a store for them to buy something to eat and drove again as they left the store and headed home. Defendant claimed he was trying to teach Mr. Mejia how to drive a standard transmission vehicle. He also testified that he remembered the accident and that Mr. Mejia still was driving at that time. Defendant maintained that it was more than a month after the accident when he began to recall the event; he admitted that he still did not remember everything about the accident.
Despite defendant's self-serving testimony, when the entirety of the evidence is viewed in the light most favorable to the prosecution, defendant's hypothesis that Petey Mejia was driving the vehicle is remote and unreasonable, especially in light of Mr. Mejia's inability to drive a standard transmission, the physical evidence and types of injuries sustained by defendant and Mr. Mejia, and defendant's statements in the ambulance and at the hospital. See State v. Pearson, 513 So.2d 459, 461-62 (La.App. 2d Cir.1987), writ denied, 519 So.2d 140 (La.), cert. denied, 487 U.S. 1236, 108 S.Ct. 2903, 101 L.Ed.2d 935 (1988). Considering defendant's own testimony that he and Mr. Mejia were the only two people in the truck, and the severity of the injuries sustained by defendant and Mr. Mejia, the alternative hypothesis that someone other than either defendant or Mr. Mejia was driving and that the person fled the scene before the ambulance and police arrived was sufficiently excluded. See State v. Boutte, 564 So.2d 398, 400 (La.App. 3d Cir.1990). The jury's verdict reflected a reasonable view of the accident. The jury reasonably rejected defendant's version that Mr. Mejia was the driver; there does not appear to be any other hypothesis which raises a reasonable doubt about defendant's being the driver of the truck. Thus, we find sufficient evidence introduced to establish that defendant was the operator of the truck.
Defendant also challenges the sufficiency of the state's proof of causation. At the trial, defendant argued that a bump located at the point where the truck reentered the highway was the cause of the accident.
In State v. Taylor, 463 So.2d 1274, 1275 (La.1985), the Louisiana Supreme Court concluded that, under the vehicular homicide statute, "the state ... must prove that an offender's unlawful blood alcohol concentration combined with his operation of a vehicle to cause the death of a human being." See also State v. Ritchie, 590 So.2d 1139, 1149 (La.1991) (on rehearing). It is insufficient for the state to prove merely that the alcohol consumption "coincides" with the accident. Taylor, 463 So.2d at 1275. The vehicular homicide statute does not impose criminal liability based solely on the coincidental fact that the fatal accident occurred (without fault on the part of the accused) while the accused was operating a vehicle under the influence of alcohol. Ritchie, 590 So.2d at 1149. See State v. Archer, 619 So.2d 1071, 1074 (La. App. 1st Cir.), writ denied, 626 So.2d 1178 (La.1993). Causation is a question of fact which should be considered in light of the totality of circumstances surrounding the ultimate harm and its relation to the actor's conduct. State v. Kalathakis, 563 So.2d 228, 231 (La.1990).
After reviewing the entirety of the trial testimony and exhibits, we conclude the state sufficiently established that defendant's unlawful blood alcohol concentration combined with his operation of the truck to cause the victims' deaths. Defendant's blood sample was taken approximately three hours after the accident, and testing established the blood alcohol concentration was 0.10 percent. *702 According to Dr. Hoffman, because of the rates at which alcohol metabolizes in the blood, defendant's reading would have been greater at the time of the accident. According to John Mejia, defendant had been drinking beer at the Mejia's residence from about noon or 1:00 p.m. until defendant and Petey Mejia went out for the evening. John Mejia also testified that he saw defendant leave twice to go buy more beer. Defendant denied being at the Mejia's residence that afternoon; he and his father-in-law testified that defendant had been crabbing and fishing in Grand Isle that day, returning home at about 6:30 or 7:00 p.m. However, even according to defendant's own testimony, he consumed five to seven beers at the Mejia's residence and drank about ten or twelve beers throughout the course of the evening. He admitted he had a "buzz" as a result of drinking alcohol.
Dr. Hoffman testified that the effect of alcohol on the human body varies depending upon the amount of alcohol consumed. He described the initial effects as being a feeling of euphoria, followed later by blurred vision, loss of inhibition, slurred speech, problems with muscular coordination, and delay in reaction. More serious effects include loss of judgment, loss of consciousness, coma, and death. Dr. Hoffman also said that a person's ability to drive a car is affected by the consumption of alcohol. Alcohol impairs the driver's perceptions, affects his ability to see sharply, impairs judgment, impairs motor coordination, and delays reactions. In Dr. Hoffman's opinion, the level of alcohol concentration in defendant's body was a contributing factor to this accident. According to Dr. Hoffman, had defendant been sober, he would have been able to handle the truck in the curve and would have been able to safely reenter the highway.[4]
Some minutes prior to the accident, defendant had driven extremely recklessly and had almost struck a vehicle driven by Susan Duet. Ms. Duet testified that she and her husband-to-be had been at Peanut's Lounge and were traveling home on La. Hwy. 1 when she noticed that a truck in front of them was backing up toward them at a high rate of speed. Frightened, Ms. Duet blew her horn and came to a stop. The other vehicle also stopped as if it was playing "chicken." Concerned that a fight between her husband-to-be and the occupants of the truck might ensue, Ms. Duet kept going. The truck then followed Ms. Duet for ¼ to ½ mile with its bumper about six inches from Ms. Duet's vehicle and with its headlights turned off. Finally, the truck crossed a double yellow line, passed Ms. Duet in a curve, and sped away. When Ms. Duet learned about the accident, she figured the truck which had harassed her was probably the truck involved in the accident because the highway otherwise was deserted that night. Ms. Duet explained that a bridge was located about ½ to ¾ mile away, which would have allowed the truck to get to Highway 308, the other side of the bayou. When Ms. Duet viewed the truck that had been involved in the accident, she recognized it as being the same truck she had seen.
Defendant's handling of his truck moments prior to the accident also showed the effect that alcohol was having on his driving. Although Sgt. Mitchell could not determine the exact rate of speed, he suggested the truck probably was traveling at an "excessive" rate of speed. Defendant drove his truck on the shoulder for 140 to 180 feet as he came out of a curve. He then abruptly reentered the paved portion of the highway and crossed over the centerline, striking the other vehicle. The effects of alcohol on defendant were evident even after the accident. He appeared intoxicated to both Trooper Falgout and the nurse at the emergency room. He had a strong smell of alcohol on his breath, was physically combative, and used profanity. According to the nurse, defendant went in and out of consciousness at the hospital as a result of the alcohol and not as the result of his injuries.
Under these circumstances, it was reasonable for the jury to infer that defendant's blood alcohol concentration contributed to his running off the road and losing control of the truck. See State v. Copes, 566 So.2d 652, 656 *703 (La.App. 2d Cir.1990). That a change in the roadway, occurring at the point where defendant reentered the highway, might also have contributed to the accident and the resulting deaths is not a defense. See Copes, 566 So.2d at 656. The assignment of error is without merit.

TESTIMONY BY TROOPER FALGOUT CONCERNING DEFENDANT BEING THE DRIVER
In assignment of error number five, defendant argues the court erred when it allowed Trooper Gregg Falgout to testify that defendant was the driver of the truck. Defendant claims that, because Trooper Falgout was not tendered as an expert witness, he should not have been allowed to render an opinion on this subject. In response, the state notes that defendant's objection to Trooper Falgout's testimony was sustained.
In support of his argument, defendant cites a portion of Trooper Falgout's testimony, wherein on direct examination the state asked Trooper Falgout if he had been able to determine who were the occupants of the two vehicles. When Trooper Falgout said he had, the state asked him who were the occupants. In response, Trooper Falgout testified that defendant was the driver of the truck and Petey Mejia was a passenger in the truck. Trooper Falgout also listed the driver and two passengers of the other vehicle. Defendant did not object to this testimony. On cross-examination defense counsel asked Trooper Falgout if he had tried to get fingerprints off the truck's steering wheel. In response to this line of questioning, on redirect, the state asked Trooper Falgout to explain why he did not try to take fingerprints. Trooper Falgout explained that he did not try to take fingerprints because defendant was the owner of the truck and at that time he had no doubt defendant was the driver. Defendant did not object to this testimony. However, when the state then asked if Trooper Falgout had any doubt "today" if defendant was the driver, defendant objected but the witness had responded, "No, sir". The court sustained the objection and instructed the jury to disregard the answer.
Trooper Falgout was not qualified as an expert witness. He had no personal knowledge that defendant was the driver of the truck, and his opinion that defendant was the driver was not rationally based on his perceptions. Thus, to the extent he offered an opinion concerning the driver of the truck, his testimony was inadmissible opinion evidence. See LSA-C.Ev. arts. 602 & 701.
However, for the following reasons, we reject the assignment of error. To preserve the right to appeal an erroneous trial court ruling which admits evidence, the objecting party must make a timely objection and state the specific ground of objection. LSA-C.Ev. art. 103(A)(1). See also LSA-C.Cr.P. art. 841; State v. Fontenot, 618 So.2d 915, 920 (La.App. 1st Cir.), writ denied, 623 So.2d 1332 (La.1993). Defense counsel did not object to the testimony that defendant cites on appeal. Accordingly, defendant is barred procedurally from advancing his claim that the evidence was improperly admitted. Moreover, Trooper Falgout's initial testimony identifying defendant as the driver of one of the vehicles was not responsive to the prosecutor's question. The prosecutor had asked only for the names of the "occupants" of the vehicles, apparently in an effort to connect Trooper Falgout's testimony to the accident described by the previous witness, Kendalyn Cheramie. When defendant later objected to the state's question concerning whether or not Trooper Falgout had any doubt at the trial that defendant was the driver, the objection was sustained. By failing to object to the earlier questions, defendant waived the right to assert this assignment on appeal.

EXPERT TESTIMONY BY SERGEANT MITCHELL
In assignment of error number eight, defendant argues the court erred when it allowed Sgt. Ralph Mitchell, Jr., to testify outside his expertise. In his brief, defendant specifically argues Sgt. Mitchell did not possess the qualifications necessary to be accepted as an expert in the field of accident reconstruction. Defendant also asserts that a portion of Sgt. Mitchell's testimony, wherein he testified that defendant was the driver *704 of the truck and that alcohol was a contributing factor in the accident, violated LSA-C.Ev. art. 704, which prohibits an expert in a criminal case from offering an opinion as to the guilt or innocence of the accused. Defendant further contends that the prejudicial effect of Sgt. Mitchell's testimony outweighed the probative value of the evidence and, thus, admission of this testimony violated LSA-C.Ev. art. 403.
Initially, we note that, because defendant did not object on the ground that Sgt. Mitchell's qualifications were insufficient, he is barred from raising this issue on appeal. When Sgt. Mitchell was tendered as an expert, defendant objected and argued generally that Sgt. Mitchell's testimony would relate to an ultimate issue to be determined by the jury. However, defendant did not contest Sgt. Mitchell's qualifications. It is well-settled that defense counsel must state the basis for an objection when it is made, pointing out the specific error to the trial court. The grounds for objection must be sufficiently brought to the court's attention to allow it the opportunity to make the proper ruling and prevent or cure any error. See LSA-C.Ev. art. 103 A.(1); LSA-C.Cr.P. art. 841. Because defendant failed to object to this issue at trial, he cannot urge the issue on appeal. See State v. LeBlanc, 618 So.2d 949, 958-59 (La.App. 1st Cir.1993). Moreover, Sgt. Mitchell's background as a certified accident reconstruction investigator with several years experience in this field, his education, extensive formal training in accident investigation, position as an instructor in this field, and previous acceptance by other courts as an expert justified the court's acceptance of him as an expert in the field of accident reconstruction. See State v. Honeyman, 565 So.2d 961, 966-67 (La.App. 2d Cir. 1990). This portion of the assignment of error is without merit.
Defendant similarly has waived any objection he might have to Sgt. Mitchell's testimony that he believed alcohol was a contributing factor to the accident. Twice the state asked Sgt. Mitchell if he thought alcohol was a contributing factor in the accident and Sgt. Mitchell responded that alcohol was a contributing factor. However, on neither of these occasions did defendant object; his general objection, voiced when Sgt. Mitchell was tendered as an expert, was insufficient to preserve this particular issue. Thus, defendant may not now raise this issue on appeal.
Defendant has preserved the issue he raises concerning Sgt. Mitchell's testimony that defendant was the driver of the truck. On direct examination, Sgt. Mitchell extensively described the various factors he considered as he investigated this accident damage to the vehicles, markings left at the scene, debris resulting from the accident, and injuries sustained by the occupants of the vehicles. After being asked if he was able to reach any conclusions insofar as the positioning of the occupants of the truck, Sgt. Mitchell twice testified that he concluded that Petey Mejia was the passenger in the truck based on the injuries Mr. Mejia sustained and the type of injuries he would expect the passenger of the truck to have had. When the state asked Sgt. Mitchell if he had drawn any conclusions concerning defendant based on the type of injuries defendant received, defense counsel objected and argued the witness was being asked to give an opinion on the ultimate issue of fact. The court overruled the objection, and Sgt. Mitchell responded, "It is my opinion without a doubt in my mind that Shane Trahan was driving based on the injuries he sustained...." Later, when asked if he had "any doubt" that defendant was the driver, that Petey Mejia was the passenger, or that alcohol was a contributing factor, Sgt. Mitchell responded to each question, "None whatsoever."
Article 704 of the Louisiana Code of Evidence regulates opinion testimony given by experts on an ultimate issue:
Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.
Thus, an expert's opinion in a criminal case is not inadmissible merely because it embraces an ultimate issue to be decided by the jury, *705 except that the expert cannot express an opinion as to the guilt or innocence of the accused. State v. Parker, 596 So.2d 315, 320 (La.App. 3d Cir.1992).
The comments to article 704 indicate the article "clarifies" prior Louisiana law and is in "harmony" with State v. Wheeler, 416 So.2d 78 (La.1982), which decision, according to the comments, "should continue to control." LSA-C.Ev. art. 704, comments (a) & (c). See also State v. Raiford, 600 So.2d 924, 928 (La.App. 4th Cir.1992). In Wheeler, the trial court accepted a police officer as an expert in the field of narcotics transactions. The state then presented the expert with a hypothetical set of facts resembling the facts of the case (possession with intent to distribute marijuana) and asked the officer what the likelihood was that the person involved in that hypothetical was involved in the distribution of marijuana. The officer responded that, in his opinion, the person was involved in the distribution of the substance. Finding this testimony "tantamount to an opinion that the defendant was guilty of the crime charged," the Louisiana Supreme Court found error in the court's admission of the evidence and reversed the conviction. 416 So.2d at 81. In doing so, the court said that variables are present in the principles which guide a trial court in deciding whether or not to admit expert witness testimony and that all of the variables weighed heavily against the admission of expert testimony on such matters as how the case should be decided or as to whether or not a defendant is guilty:
The evidence is not truly expert testimony because it relates to matters well within the jury's understanding and is wholly without value to the trier of fact in reaching a decision; the inference or opinion is abstract and indirect; and it relates to an ultimate issue rather than a collateral matter. When an objection is raised to the introduction of an expert's opinion or inference, care should be taken by the trial judge to assess the statement in light of each of the foregoing variables.
416 So.2d at 81. See also State v. Jones, 558 So.2d 546, 551 (La.1990); State v. Montana, 421 So.2d 895, 899 (La.1982). The final sentence of article 704 codifies the position taken by the court in Wheeler, that expert testimony concerning whether or not a defendant is guilty is inadmissible.
Consistent with Wheeler, the Louisiana Supreme Court has said "it is reversible error for an expert to testify as to an ultimate issue of the defendant's guilt, even when couched in terms of a hypothetical situation." State v. Code, 627 So.2d 1373, 1384 (La.1993). In Code, the court found that article 704 was expressly violated when a fingerprint expert in a first degree murder case testified that he positively believed that palm prints left by the defendant on the victim's bathtub were left when the defendant drowned the victim. The court further found that article 704 was implicitly violated when an expert in fingerprint and crime scene analysis testified that palm prints lifted from the bathtub, which had been matched to the defendant's, were left by the perpetrator of the crime. Code, 627 So.2d at 1384. The Louisiana Supreme Court has repeatedly reversed convictions in drug cases wherein a police officer, qualified as an expert in the field of narcotics transactions, was allowed to give an opinion based upon hypothetical facts resembling the particular case that the defendant intended to distribute the drugs, as opposed to merely possessing them. See State v. White, 450 So.2d 648 (La.1984); Montana, 421 So.2d at 899-900; Wheeler, 416 So.2d at 81-82. See also State v. Bosworth, 593 So.2d 1356, 1360-61 (La.App. 4th Cir.), writ denied, 600 So.2d 658 (La.1992). Although finding such expert testimony inadmissible, the court has distinguished as being admissible certain expert testimony which amounts to a recitation of the characteristics of drug dealers. See Montana, 421 So.2d at 899. See also White, 450 So.2d at 650 (testimony that possession of twenty-five foils of heroin was generally considered a wholesale amount of heroin found admissible; testimony that the person described in the hypothetical was on the street for the purpose of selling narcotics found inadmissible); Wheeler, 416 So.2d at 82 (testimony that it is quite common for marijuana distributors to carry revolvers found admissible; testimony that the reason the person in the hypothetical had a revolver was to avoid being ripped off while he was selling drugs found inadmissible).
*706 Applying these principles to the instant case, it is apparent the court erred when it overruled defendant's objection. While it was proper for Sgt. Mitchell to testify concerning the types of injuries typically sustained by occupants of a vehicle damaged in a fashion similar to the truck, it was error to allow Sgt. Mitchell to offer his opinion that defendant was the driver of the truck. On appeal, the state argues the court properly overruled the objection because Sgt. Mitchell did not testify as to all of the elements necessary to find defendant guilty and did not comment on defendant's guilt or innocence. However, this position ignores the approach taken by the Louisiana Supreme Court in the drug cases cited above. In these cases, the court found expert testimony relating to the person's intent to distribute to be an expression of the defendant's guilt even though other elements also were required (i.e., the defendant's identity as the perpetrator and proof the substance was a controlled dangerous substance). Considering that defendant's main defense in the instant case was that he was not the driver, Sgt. Mitchell's testimony was tantamount to an opinion that defendant was guilty. See Wheeler, 416 So.2d at 81.
Finding error under article 704, however, does not end our analysis. In Code, the Louisiana Supreme Court held that error resulting from the improper admission of an expert's opinion concerning the ultimate issue of a defendant's guilt is subject to a harmless error analysis. 627 So.2d at 1384. The court then said that the proper analysis for determining harmless error in such a situation is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." 627 So.2d at 1384 (quoting Sullivan v. Louisiana, ___ U.S. ___, ___, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) (emphasis in original)).[5] The Court also quoted the harmless error analysis suggested by Justice Scalia in his concurrence in Carella v. California, 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989) (per curiam):
When the predicate facts relied upon in the instruction [an erroneous jury instruction on the applicability of a mandatory conclusive presumption], or other facts necessarily found by the jury, are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings is functionally equivalent to finding the element required to be presumed. The error is harmless because it is "beyond a reasonable doubt" that the jury found the facts necessary to support the conviction.
Code, 627 So.2d at 1385 (quoting Carella, 491 U.S. at 270, 109 S.Ct. at 2423-24 (J. Scalia, concurrence; internal citation omitted)).
After discussing these two harmless error standards, the Louisiana Supreme Court then found that, under either analysis, the error in admitting the expert testimony (that the defendant had left his palm prints on the bathtub when he drowned the victim) was harmless. In doing so, the court considered *707 the following factors: five expert witnesses testified that the palm prints recovered from the bathtub matched the defendant's prints and were left on the recently cleaned bathtub near the time of the murder; the expert testimony made clear the prints were inconsistent with those that would be left as someone got in or out of the bathtub; expert testimony established the prints were in such a position that they could only have been left by someone who held the victim over the bathtub, and the position of the victim's body supported this conclusion; extensive evidence showed the defendant had never rented the victim's house and had never worked there as a plumber. The court instructed the jury that it alone, and not the experts, was to determine the ultimate issues and that it could accept or reject the testimony of the experts. 627 So.2d at 1385.
Under either of the harmless error standards discussed in Code, the record of the instant case shows the error at issue here, as in Code, was "unmistakably harmless." 627 So.2d at 1385. Sgt. Mitchell explained that, at the time of an accident, occupants of a vehicle continue moving in the same direction. Because the truck rotated counterclockwise after impact, the occupants of the truck, by continuing to move forward, moved to the right side of the truck. Sgt. Mitchell explained the types of injuries he would expect the occupants to have suffered, based upon the physical damage to the truck. The damage to the truck is evident in the enlarged photographs introduced by the state, which show that the main damage occurred at the front of the truck on the passenger side. The doctor who performed the autopsy on Petey Mejia testified that, as a result of his examination, he determined that the impact Mr. Mejia received on his right side was of sufficient force to cause serious internal bleeding, broken ribs, and a dislocated collarbone. In the final instructions to the jury, the court told the jurors that they "are the sole judges of the law and the facts on the question of guilt or innocence" and that they should give an expert's opinion such weight as they thought it deserves and could disregard the opinion "entirely."
Considering the admissible evidence concerning the damage to the truck and the manner in which the accident occurred, no rational juror could find those facts without also finding the ultimate fact of defendant's guilt. As in Code, "[i]t is beyond doubt the guilty verdict in this case was unattributable to the erroneous testimony." 627 So.2d at 1385. The assignment of error is without merit.

EXCESSIVE SENTENCES
In assignment of error number nine, defendant argues the court imposed excessive sentences. He specifically argues the court should have suspended the sentences because of numerous mitigating circumstances, including defendant's status as a first offender, his steady work history, and the hardship his incarceration places on his wife and young child.
The penalty for vehicular homicide is a fine of not less than $2,000 nor more than $15,000 and imprisonment with or without hard labor for not less than two years nor more than fifteen years. LSA-R.S. 14:32.1 (prior to its amendment by 1993 La.Acts, No. 410, § 1). Thus, the court's imposition on each count of the payment of a $2,000 fine and imprisonment for ten years at hard labor is in compliance with the statutory requirements.
Defendant was sentenced on December 22, 1992. Thus, the new sentencing guidelines were in effect. Before imposing the sentences, the court noted that the appropriate grid level for defendant under the sentencing guidelines was 3-G, which is in the intermediate discretionary zone and provides for a term of incarceration of 24 to 48 months or the imposition of 100 to 150 sanction units. Finding aggravating circumstances, the court elected to depart from the guidelines and cited its reasons. In the motion to reconsider sentence, defendant argued the court erred when it departed from the sentencing guidelines because, according to defendant, the court improperly considered as aggravating circumstances factors which typically occur in a vehicular homicide case or which are elements of the offense. On appeal, defendant does not contest the court's application of the sentencing guidelines or upward departure from the recommended *708 range. Defendant's sole complaint is that the sentences are constitutionally excessive. Thus, our review is limited to the constitutionality of the sentences.[6]
Although a trial court has wide discretion in the imposition of a sentence within statutory limits, the discretion is not unbridled. Imposition of a sentence, although within the statutory limit, may violate a defendant's constitutional right against excessive punishment. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). See LSA-Const. art. I, § 20. A sentence will be determined to be constitutionally excessive if it is grossly disproportionate to the crime or is nothing more than the needless imposition of pain and suffering. The determination turns upon the punishment and the crime, in light of the harm to society, and whether or not the penalty is so disproportionate that it shocks our sense of justice. State v. Waguespack, 589 So.2d 1079, 1086 (La.App. 1st Cir.1991), writ denied, 596 So.2d 209 (La. 1992). A sentence may be excessive either by reason of its length or because the circumstances warrant a less onerous sentencing alternative. Waguespack, 589 So.2d at 1086. A sentence imposed within the statutory limits should not be set aside as excessive in the absence of a manifest abuse of discretion. Sepulvado, 367 So.2d at 767.
Before sentencing defendant, the court reviewed the presentence investigation report and numerous letters submitted by the victims' and the defendant's families and friends. In giving extensive reasons for the sentences, the court first discussed the facts of the offenses and noted that defendant's encounter with the vehicle driven by Susan Duet prior to the accident showed his extreme and wilful recklessness. The court found that defendant's only concern after the accident was for the condition of his truck and that he expressed neither remorse for the accident nor interest in the fate of the victims. The court also described defendant's family and background. Defendant was twenty-two years old. He was married, had a three year old son, and his wife was expecting their second child. The court acknowledged that defendant had never completely recovered from his father's death, which occurred when defendant was a teenager and resulted in defendant's hospitalization to assist him in handling the grief. According to comments made by defendant contained in the PSI, defendant sought relief from the pain of a back injury by drinking. Although the court noted that defendant expressed regret for the accident when interviewed for the PSI, the court was extremely bothered that defendant was observed drinking at a bar and then driving away while on bond awaiting trial in this case. The court also concluded that defendant's testimony that Petey Mejia was the driver was incredible and showed defendant's unwillingness to accept responsibility for the victims' deaths. The court classified defendant as a first felony offender and indicated that defendant's criminal record was clean and did not even contain a speeding ticket.
After finding that concurrent sentences were appropriate, the court stated that an upward departure from the sentencing guidelines was required. Defendant's driving was grossly reckless and created a risk of death or great bodily harm for more than one person. The court explained that in a typical vehicular homicide case, the accident is the result of momentary inadvertence on the *709 part of the driver. However, in this case defendant demonstrated wanton and reckless disregard for the life and safety of others. By his actions he was, in essence, playing games with the lives of people. The court also noted that although Kendalyn Cheramie was seriously injured during the accident, a sentence would not be imposed for her injuries. The court indicated that defendant continued to pose a risk to public safety, that he was in need of correctional treatment or a custodial environment which could be provided most effectively by his commitment to an institution, that his criminal conduct was not the result of circumstances which were unlikely to repeat, and that his character and attitude did not indicate he was unlikely to commit another crime. The court also found that defendant had not shown he was likely to respond affirmatively to probationary treatment.
Considering the severity of defendant's alcohol problem (as reflected in the PSI) and defendant's persistence in continuing to drink and drive even after this tragic accident, the court's decision not to suspend the sentences was appropriate. After reviewing the written and oral comments made by the court before imposing the sentences, we find no abuse of discretion in the court's imposition on each count of ten years and a $2,000 fine. The assignment of error is meritless.

STATE'S FAILURE TO DISCLOSE EXCULPATORY EVIDENCE
In assignment of error number eleven, defendant contends a motion for new trial should be granted because the state withheld exculpatory evidence when it failed to disclose that Thelma Slade, an employee of the ambulance company that transported defendant, would have testified that defendant was unconscious during the trip to the hospital and was not in a condition to talk to anyone after the accident. Defendant asserts this testimony would have assisted him in rebutting the testimony of Kendalyn Cheramie concerning statements made by defendant in the ambulance.
Defendant claims that, after the trial, he discovered that the state had failed to provide this alleged exculpatory evidence. He did not file a motion for new trial on this ground, nor did he raise this issue before the trial court in any manner. Thus, the existing record contains no facts in support of defendant's assertions. As an appellate court, this court has no authority to receive or review evidence not contained in the trial court record. State v. Johnson, 529 So.2d 466, 474 n. 4 (La.App. 1st Cir.1988), writ denied, 536 So.2d 1233 (La.1989). If defendant seeks to prove his allegations that the state failed to provide him with exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), his proper remedy is by post-conviction relief, wherein an evidentiary hearing could be conducted if necessary. See State v. Walter, 542 So.2d 586, 590 (La.App. 1st Cir.), writ denied, 546 So.2d 1222 (La.1989).
The assignment of error lacks merit.
For the reasons set forth in this opinion, the convictions and sentences are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] Melissa Perry testified for the state on rebuttal that defendant told her about a month to a month and a half after the accident that he recalled trying to help get Ms. Comeaux out of the car. Thus, the location where Trooper Falgout saw defendant when he arrived might not have been defendant's initial landing place after the accident.
[2] Sgt. Mitchell testified that the truck traveled on the shoulder for about 140 feet before returning to the roadway. Initially Trooper Falgout testified that the truck was on the shoulder for about 65 feet. Later he corrected himself and said the truck traveled on the shoulder for about 180 feet.
[3] Sgt. Mitchell also testified that, in his opinion, defendant was the driver of the truck. This testimony in part forms the basis for assignment of error number eight.
[4] Sgt. Mitchell reached a similar conclusion. His opinion that alcohol was a contributing factor in this accident in part forms the basis for assignment of error number eight.
[5] In Code, the Louisiana Supreme Court indicated, without discussing, that the harmless error standard advanced in Sullivan v. Louisiana, "replaced the earlier harmless error analysis of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)." 627 So.2d at 1385. However, the United States Supreme Court in Sullivan v. Louisiana actually relied extensively on Chapman v. California and merely held that the error present in Sullivan v. Louisiana (erroneous definition of reasonable doubt in jury instruction) was a structural defect and, therefore, the type of constitutional error which defied analysis by harmless error standards. ___ U.S. at ___, 113 S.Ct. at 2082-83. The Court reaffirmed that trial errors which occur "during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented" were subject to a harmless error analysis. At ___, 113 S.Ct. at 2082-83 (quoting Arizona v. Fulminante, 499 U.S. 279, 307-09, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991) (opinion of Rehnquist, C.J., for the Court)). Under Chapman v. California, before a federal constitutional error can be held harmless, the beneficiary of a constitutional error must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. 386 U.S. at 24, 87 S.Ct. at 828. To say that an error did not contribute to a verdict is to find the error unimportant in relation to everything else the fact finder considered on the issue in question as revealed in the record. Yates v. Evatt, 500 U.S. 391, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991).
[6] In State v. Ecter, 614 So.2d 198, 202 (La.App. 3d Cir.), writ denied, 617 So.2d 1181 (La.1993), the court indicated that the new sentencing guidelines should be consulted as an aid in determining if a sentence is constitutionally excessive. In State v. Gladney, 626 So.2d 778 (La.App. 2d Cir.1993), the court concluded that a sentence imposed within the designated sentence range of the appropriate grid cell will not be deemed excessive under the Louisiana Constitution. To the extent these decisions imply that compliance with the guidelines automatically results in compliance with the Louisiana Constitution's prohibition against excessive punishment, we decline to follow these decisions. See Gladney, 626 So.2d at 779-80 (Brown, J., concurring). While the factors described in the new sentencing guidelines certainly are appropriate factors for an appellate court to consider in reviewing a sentence for constitutional excessiveness, See State v. Sepulvado, 367 So.2d 762, 767-69 (La. 1979), there is no statutory or jurisprudential support for finding that a sentence must be in compliance with the new guidelines in order for an appellate court to find that it is not constitutionally excessive or for finding that a sentence imposed in compliance with the guidelines need not be viewed any further for constitutionality.