719 So.2d 156 (1998)
STATE of Louisiana, Appellee,
v.
Joseph WAFER, Appellant.
No. 31078-KA.
Court of Appeal of Louisiana, Second Circuit.
September 23, 1998.
*158 Louis G. Scott, Bastrop, for Appellant.
Richard Ieyoub, Attorney General, James D. Caldwell, District Attorney, James E. Paxton, Assistant District Attorney, for Appellee.
Before WILLIAMS, STEWART and GASKINS, JJ.
GASKINS, Judge.
The defendant, Joseph Wafer, was convicted of second degree murder and sentenced to the mandatory term of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. He appeals. For the reasons assigned below, we affirm the defendant's conviction and sentence.

FACTS
The present case is the second appeal to come before this court concerning the October 1995 stabbing death of Jimmy Nash. Co-defendant Charles Butler's conviction and sentence were recently affirmed by this court.[1] See State v. Butler, 30,798 (La. App.2d Cir. 6/24/98), 714 So.2d 877.
The 69-year-old victim lived alone in his home in Newellton, Louisiana, and was known within his family to carry a substantial amount of cash in his wallet. His daughter Gwen Nash Butler and her husband Charles "Terry" Butler lived two doors down from him, and Gwen Butler had a key to her father's home. On weekends, Layla Butler, the Butlers' daughter and Mr. Nash's granddaughter, regularly stayed with Mr. Nash. However, on the weekend of October 28-29, 1995, Layla Butler was not scheduled to stay with her grandfather because of homecoming festivities at her college.
Just before 6:00 p.m. on Saturday, October 28, 1995, Charles Butler approached Newellton resident Terrance Gales and asked Gales if he had any crack cocaine for sale. When Gales responded that he did not, Butler produced a pistollater identified as the property of the victimand asked Gales if he would loan him $40 and keep the pistol as security. Gales loaned Butler the money and kept the pistol.
Sometime in the early evening, four men drove from Tallulah to Newellton. These menBernard Johnson, Thorneial "Dough Boy" Wilmore[2], Robert Barnett, and the defendant, Joseph "Crab" Waferstopped first at the trailer home of Claudine Bradford.
*159 Ms. Bradford, Charles Butler's cousin, sometimes bought crack cocaine from the defendant; that evening she allowed the defendant to use her trailer to "cut up" drugs in exchange for crack.
While Ms. Bradford and Johnson smoked crack, the other men went to a house on Front Street; the defendant and Wilmore gambled on dice. Terrance Gales was there, gambling with the defendant, and lost about $300 to him. Gales said that Butler was there as well and that Butler spoke to the defendant.
Later, the defendant and Wilmore met with Tyrone Gales, a crack dealer from Tallulah, on a street corner not far from where Mr. Nash and the Butlers lived. These men caught a ride with Chris Jackson to the Trak Store in Newellton and then Jackson returned them to the street corner.
As the defendant, Wilmore and Tyrone Gales stood on the street corner, Charles Butler approached them. Gales knew Butler as a previous customer for crack but did not try to sell Butler any drugs because he knew that the defendant and Wilmore probably had better merchandise. The four men walked up the street. As they walked, Gales heard one of the men say "Do you want to go jack somebody?" According to Gales, to "jack" someone means to rob them of either money or drugs. The four agreed to this plan and continued to walk up the street.
When they reached the victim's home, Butler walked up to the front door and Gales heard a click before the door opened, although he never actually saw Butler with a key. The four went into Mr. Nash's home, as did Barbara Sims, a teenage girl who happened upon the scene. The defendant and Butler proceeded to the victim's kitchen and rummaged through a drawer, and the two men then went back to the victim's bedroom. Gales heard the victim's door close and then:
[A]nd at the time I started hearing a moaning sound, as if his face was being covered up. And I heard a loud punching sound. At the time ... I thought that they were jumping on him, because I knew if his face or mouth hadn't been covered, that it would've been a lot of screaming. And it was a lot of neighbors around that would've heard it. So it was a loud moan for about a couple of seconds. And after then, ThorniealI mean Terry Butler and Joseph Wafer came out of the room running. And when they ran, then all of us ran behind them.
The men fled from the victim's home and met back at Ms. Bradford's trailer; Ms. Sims also left the scene but did not follow the men.
Ms. Bradford testified that the defendant and Wilmore entered her trailer first, carrying two bloody shirts and a bloody knife. The defendant gave her the shirts and instructed her to soak them in bleach and detergent. She testified that the defendant also gave her the knife and told her to throw it away. Tyrone Gales came in after the defendant and Wilmore arrived. When Gales asked the defendant what had happened, he pointed and said "Terry."
Ms. Bradford watched as the defendant counted out about $1,500 on her table. She testified that she and Butler then smoked crack cocaine. Ms. Bradford said that as the men left her trailer, the defendant told her not to say anything about these events or she would "be caught up in it too." The men left her $150 in cash and two rocks of crack cocaine.
Johnson drove the defendant, Wilmore and Barnett back to Tallulah. After they arrived, Johnson, who had been taking medication and drinking alcohol in addition to smoking crack, passed out. Barnett saw the defendant and Wilmore take Johnson's car and leave. At 11:00 p.m., Johnson's car was found wrecked in a ditch on the street in Tallulah where the defendant lived.
The next morning, one of the victim's granddaughters discovered him dead in his home. Police determined that Mr. Nash had been stabbed repeatedly and that his wallet was missing. A pillow was found on or next to the body. Police also found no signs of forced entry into the home. Later that day, Terrance Gales heard of the murder and turned the victim's gun over to police.
On November 14, 1995, Ms. Bradford spoke to police; she gave several inconsistent *160 statements and implicated persons who were not actually involved in the offense. Tyrone Gales was arrested on November 15, 1995. After he was incarcerated and had spoken to police, he sent a document to the district court stating that the sheriff forced him to make statements incriminating the defendant and Butler. At trial, Gales explained that he signed the document on the advice of "inmate counsel" who told him that this statement would cause him and the others to be released from jail. Gales testified pursuant to an agreement whereby he was allowed to plead guilty to simple robbery and was sentenced to no more than five years imprisonment for his part in these events. (He was originally charged with first degree murder, armed robbery, possession of cocaine and possession of drug paraphernalia.)
The defendant was arrested on November 16, 1995. He was originally charged with first degree murder. Prior to trial in July 1997, the charge was amended to second degree murder.
The defendant's mother testified that she saw the defendant in Tallulah at his grandmother's house shortly before 10:00 p.m. on the night of the murder.[3] His grandmother, who returned from work at 11:00 p.m., testified that the defendant was at her home from that time onward. Victor Dailey testified that he was with the defendant at a bar in Tallulah between 9:00 p.m. and 9:30 p.m. that night. Dexter Taylor told a similar story. Ronald Barnett testified that he was with Tyrone Gales in Tallulah that night from at least 5:00 p.m. to 11:00 p.m.
The defendant, who admitted that he had a 1993 conviction for distribution of crack cocaine, testified that he had been in Newellton gambling on the night of October 28 but denied any involvement in the murder. He said that he was back in Tallulah by 9:30 that night and did not return to Newellton.
The jury convicted the defendant of second degree murder, and the court imposed the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. He now appeals. Although the defendant initially asserted 12 assignments of error, five of them were not briefed and are deemed waived. URCA Rule 2-12.4; State v. Schwartz, 354 So.2d 1332 (La.1978); State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writs denied, 558 So.2d 1123 (La.1990). The remaining assignments of error present six issues for our review.

HEARSAY
By this assignment of error, the defendant complains generally that the court failed to exclude hearsay evidence throughout the trial and, in particular, argues that the court should not have allowed Investigator Jessie Esters to testify about a statement made by Thorneial Wilmore. Since the defendant has specifically complained on appeal of just Esters' testimony, only that evidence will be addressed by this court.
Jessie Esters, the chief investigator for the district attorney's office, assisted Deputy Karl Jones of the Tensas Parish Sheriff Office in interviewing people and taking statements on and after November 14, 1995. In May 1996, Esters took statements from Tyrone Gales and Thorneial Wilmore. He testified about these statements:
Esters: [E]arlier, I had talked to Mrs. Claudine Bradford and I had to check her information off against Mr. Tyrone Gales. And later I used Tyrone Gales statement to match up and with the information I had gotten about the other person, Thonieal Wilmore. And at the time, everything that Thonieal WilTyrone Gales told me, matched up with ... what later was said by Thonieal Wilmore.
Prosecutor: Had they been together or [sic]?
Esters: They hadn't been together, because Tyrone Gales had been incarcerated in Winnsboro. And Thonieal Wilmore had been incarcerated in East Carroll Parish.
Prosecutor: So, May 28 or thereabouts of 1996, Tyrone Gales gave a statement that *161 was corroborated by Wilmore, is that a fair statement?
Esters: Yes, sir.
The defendant objected to none of this testimony. On cross-examination, the defendant asked the witness whether Wilmore was represented by counsel when he made his statement, and the investigator testified that Wilmore did not have an attorney at that point.
On redirect, the state showed the investigator Wilmore's statement, and the investigator testified that the statement showed that Wilmore had been advised of his Miranda rights before making the statement. The following exchange then occurred:
Prosecutor: ... So, before he makes the statements, he's advised of his rights, and apparently he gave up those rights,
Esters: Yes, he did.
Prosecutor: and made a voluntary statement?
Esters: That's true.
Prosecutor: Which you said corroborated independently, Mr. Tyrone Gales statement, which put the defendant back in the room murdering Mr. Nash, did it not?
Esters: That's true.
Prosecutor: Okay.
The defendant did not object to this testimony. Esters was the last witness called by the state for its case-in-chief, and the state rested after this exchange. At that point, the court took a 10-minute recess. When court resumed, the defendant made a motion for a mistrial based upon Esters' last statement. The trial court denied the motion, noting that both sides had asked, without objections, about the statement.
Thorneial Wilmore did not testify at trial. At the time he made his statement to Esters, Wilmore was in jail on another charge and had not yet been charged in connection with the Nash murder. Following his statement, he was charged. Wilmore was subpoenaed to testify and was called by the defendant. However, he never took the stand because the court was informed by Wilmore's attorney that his client would exercise his Fifth Amendment privilege not to testify.
La.C.Cr.P. art. 841 provides that no irregularity or error may be availed of after verdict unless it was objected to at the time of occurrence. La. C.E. art. 103 provides that error may not be predicated upon a ruling admitting evidence unless a substantial right of the party is affected and
a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection....
The first circuit has held that an objection made after a witness has answered an objectionable question is untimely. State v. Lynch, 94-0543 (La.App. 1st Cir.5/5/95), 655 So.2d 470, writ denied, 95-1441 (La.11/13/95), 662 So.2d 466. See also State v. Ross, 604 So.2d 1036 (La.App. 1st Cir.1992), reversed on other grounds, 623 So.2d 643 (La.1993). In State v. Brown, 354 So.2d 516 (La.1978), the supreme court ruled untimely a defense objection to a prosecutor's cross-examination questions about a witness' post-arrest silence when the defendant waited to object "until after the witness had already fully answered all of the prosecutor's queries on the subject."
In this case, defendant sought a mistrial as relief, but the basis for the requested relief was the exposure of the jury to evidence about what Wilmore saidan evidentiary problem. Accordingly, there is no reason to treat the request for a mistrial differently than an evidentiary objection for purposes of La.C.Cr.P. art. 841. As such, the motion was untimely. The first reference to Wilmore's statement was made by the witness, not the prosecutor, and the defendant should have objected at that time. The prosecutor subsequently repeated that reference in another objectionable question, and the defendant had the opportunity to object but did not do so. In fact, defense counsel asked the witness whether Wilmore made his statement with the benefit of counsel. Finally, the prosecutor referred specifically to Wilmore's corroboration of the defendant's participation in the murder in a question, and the defendant objected only after the question was answered, testimony was concluded, and the court had taken a recess.
*162 Furthermore, we note that, even had defense counsel made a timely objection, the testimony given by this witness was merely cumulative of that properly presented by other prosecution witnesses. Consequently, we find that this assignment of error is without merit.

PRODUCTION OF WITNESSES' STATEMENTS
In this assignment of error, the defendant complaints of the state's failure to provide him with copies of prior inconsistent statements given by witnesses Claudine Bradford and Barbara Sims. He contends that any such statements were exculpatory and that he was entitled to them under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
As early as January 1996, the defendant sought exculpatory evidence, as well as statements of co-conspirators. The state informed the defense that while it planned to use the testimony of Ms. Bradford and Ms. Sims, it did not consider them co-conspirators. It objected to producing their statements. In July 1996, the trial court instructed the state to produce all recorded or written statements by these witnesses for in camera inspection. However, the record fails to show any further ruling by the trial court as to the in camera inspection.
On July 22, 1997, after the jury in the instant criminal case was empaneled, the defense complained to the trial court that it had not been provided with statements by Thorneial Wilmore and Ronald Barnett. However, no mention was made of the statements of Ms. Bradford and Ms. Sims. When Ms. Bradford testified on July 24, 1997, the defendant did not object to her testimony on the basis that he had not been provided with her prior statements.[4] To the contrary, both the state and the defendant questioned her extensively about her prior inconsistent statements to the police. In particular, the defense raised numerous inconsistencies between her trial testimony and her prior statements, including:
 the involvement of the defendant in the offense. Ms. Bradford first denied that the defendant was involved and later inculpated him;
 the alleged involvement of Ronald Barnett in the offense;
 the alleged involvement of a person named William "Moose" Thomas in the offense;
 the time she saw the defendant on the evening of the murder.
Furthermore, defense counsel interviewed Ms. Bradford before the trial, and she admitted inconsistencies between that interview and her testimony regarding her cocaine use, what she heard on the night of the murder and the whereabouts of the defendant. Additionally, the defendant raised these inconsistencies during his cross-examination of Jessie Esters, who took Ms. Bradford's statements.
The state is generally under no obligation to provide a defendant with statements made to the District Attorney or to an investigative body. State v. Ates, 418 So.2d 1326, 1328 (La.1982). See La.C.Cr.P. art. 723. However, this rule is not absolute. Brady v. Maryland, supra, requires the state, upon request, to produce evidence that is favorable to the accused where it is material to guilt or punishment. See La.C.Cr.P. art. 718. The state's Brady obligation extends to evidence impeaching the testimony of a witness when the reliability or credibility of that witness may be determinative of defendant's guilt or innocence. Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); State v. Ortiz, 567 So.2d 81 (La.1990); State v. Davenport, 399 So.2d 201 (La.1981).
However, this assignment of error does not present reversible error. Even if the prosecution sought to withhold the substance of Ms. Bradford's prior statements from the defendant, their efforts were unsuccessful. *163 Although the defendant evidently did not have a transcript of Ms. Bradford's prior statements, he was clearly aware of the inconsistencies among the statements and between these statements and the witness' testimony at trial. The defendant's cross-examination of Ms. Bradford is replete with references to the substance of the witness' prior statements, and the jury was made aware that she had implicated persons other than the defendant in this crime. Ms. Bradford repeatedly explained to both the state and the defense that these inconsistencies were the result of her fear of reprisals and of "getting involved."
The defendant's pretrial motion to compel discovery indicated that counsel had "visit[ed]" co-defendant Charles Butler's trial. While the record does not show, as the state contends, that counsel "attended" this trial, the record does show that the defendant was clearly aware not only that Ms. Bradford had made prior inconsistent statements but also of the substance of these statements. The absence of a defense objection to the court's apparent failure to rule on the defendant's motion to discover these statements and his later request for only the statements of Barnett and Wilmore are further evidence that the defendant knew the substance of Ms. Bradford's statements.
Because the defendant was aware before trialof the evidence impeaching Ms. Bradford's credibility and indeed used that evidence at trial, review under Kyles and Bagley shows that the prosecution's failure to disclose Ms. Bradford's statements is not reversible error. As those cases recognize, constitutional error results when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682, 105 S.Ct. at 3383. See also State v. Marshall, 94-0461 (La.9/5/95), 660 So.2d 819. In the present case, the defendant was aware of the evidence before trial began, albeit not by any action of the prosecutor. Accordingly, there is no chance that the result of the proceeding would have been different had the prosecutor taken a different "tack." Kyles, 514 U.S. 419, 115 S.Ct. at 1568. See State v. Cass, 356 So.2d 936 (La.1977), cited in State v. Joe, 28,198 (La.App.2d Cir.7/26/96), 678 So.2d 586, writ denied, 97-0559 (La.10/31/97), 703 So.2d 16.
This assignment of error is without merit.

CLOSING ARGUMENTS
By this assignment of error, the defendant complains of several portions of the state's closing argument. However, the defendant's failure to object to all but one of these arguments waives those claims on appeal.

Waived Arguments
In describing the likely motives for the commission of this crime, the prosecutor said that the defendant was a convicted drug dealer "from out-of-town." The prosecutor later used the out-of-town argument to explain why it took police several months to solve the crime. On rebuttal, defense counsel argued with some force that the out-of-town argument was a prosecution effort to "appeal to a local sense or appeal to something besides what the evidence is."
On appeal, the defendant argues that the above arguments were an effort to paint the defendant as an outsider. However, both of the complained-of statements were true; the defendant was from Tallulah, and he admitted that he had a conviction for distribution of crack cocaine. Further, the defendant's failure to object to these arguments waives any alleged error on appeal. La. C. Cr. P. art. 841; State v. Hart, 96-0697 (La.3/7/97), 691 So.2d 651.

Preserved Arguments
The portion of the prosecutor's closing argument to which the defendant objected concerned defense witness Victor Daily. During the trial, Daily testified that he was with the defendant in Tallulah at 9:00 p.m. on the night of the murder. On cross-examination, the prosecutor elicited that this witness was currently in jail for attempted possession of cocaine. Next came the following exchange:
Prosecutor: Weren't you the guy they were chasing when they [sic] kill a police officer in Tallulah?
Witness: If you want to say so (laughing).

*164 Prosecutor: Aren't you the one that took `em back and told them where the dope was a few days later after "Tank" Williams got killed?
Witness: I don't know. I guess so.
Prosecutor: You don't remember?
Witness: (no response)
No details of this incident explaining these questions appear in the record.
During closing arguments, on rebuttal, the state challenged the credibility of the defense witnesses supplying the defendant with an alibi:
Prosecutor: Here's your citizens coming down here to do their civic duty. Mr. Victor Daily, who's got a police officer killed in Tallulah. Ah, hehe's aa convicted dope dealer and the evidence shows you that Mr. Daily admitted that a police officer died while he was getting evidence. That's one of your good citizens to come down here.
The defense made no objection to these statements. The prosecutor continued with his rebuttal argument. Eventually he returned to the credibility of witnesses:
Prosecutor: [I]t is a drug case that ended up in murder. The demeanor of Dexter Taylor, their facial expressions, they laid back. Here's Dexter Taylor about six foot four; he's unemployed; he's leaning on his family. Here's Victor Daily in jail, and has been responsible for a policeman's death. You know ...
Defense counsel: II object.
Prosecutor: We are sitting here looking at these kind of people.
Defense counsel: II object and move for a mistrial on that one.
Court: Okay. Denied. You may resume.
The prosecutor made no further reference to the death of a policeman.
La. C. Cr. P. art. 774 provides:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
Comment on the credibility of witnesses is proper and within the scope of closing argument. State v. Martin, 539 So.2d 1235, 1240 (La.1989).
In State v. Sanders, 93-0001, pp. 16-17 (La.11/30/94), 648 So.2d 1272, 1285-1286, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996), the supreme court said:
This court has stated as a general matter that a prosecutor retains considerable latitude in making closing arguments. State v. Byrne, 483 So.2d 564 (La.1986), cert. denied, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); State v. Morris, 404 So.2d 1186 (La.1981). Even when it has found that a prosecutor has exceeded that latitude, the court has often criticized the improper arguments without finding that they constitute reversible error. See, e.g., Byrne, supra; State v. Jarman, 445 So.2d 1184 (La.1984); State v. Messer, 408 So.2d 1354 (La.1982). Specifically, this court will not overturn a guilty verdict on the basis of improper argument unless "firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict." Byrne, 483 So.2d at 572; Messer, 408 So.2d at 1357. [Footnote omitted.]
The state must base conclusions and deductions in closing argument upon the evidence adduced at trial. However, the state and the defendant are permitted to draw their own conclusions as to what the evidence establishes, and both may press upon the jury any view arising out of the evidence. State v. White, 27,188 (La.App.2d Cir.8/23/95), 660 So.2d 515; State v. Kennon, 588 So.2d 1348 (La.App. 2d Cir.1991), writ denied, 600 So.2d 634 (La.1992); State v. Mills, 505 So.2d 933 (La.App. 2d Cir.1987), writ denied, 508 So.2d 65 (La.1987). Further, the trial court judge has wide discretion in controlling the scope of closing argument. State v. White, supra.; State v. Kennon, supra.
An appellate court should not reverse on grounds of improper closing argument unless it is thoroughly convinced the remark influenced the jury and contributed *165 to its verdict. In making this decision, credit should be given to the jury's good sense and fairmindedness. State v. Harvey, 26,613 (La. App.2d Cir.1/25/95), 649 So.2d 783, writs denied, 95-0430 (La.6/30/95), 657 So.2d 1026 and 95-0625 (La.6/30/95), 657 So.2d 1028.
Although the prosecutor's brief colloquy with the witness did not establish that the witness was "responsible" for the death of a police officer, there was at least some evidence that he was connected with that event and the comment was the prosecutor's conclusion about what that evidence established. Further, to the extent that this conclusion was unjustified, the defendant has not shown that the comment influenced the jury or contributed to the verdict, particularly in this lengthy trial with numerous witnesses. The defendant has proved little if any prejudice from the comment, and certainly the error in allowing the comment, if any, was harmless beyond a reasonable doubt.[5]
This assignment of error is without merit.

EVIDENCE OF PRIOR CRIMES
In two assignments of error, the defendant asserts that the trial court erred in denying his motions for mistrial pertaining to use of evidence of other crimes admitted without notice to him. He contends that it was not necessary for the state to present any evidence regarding drug sales or use. To the contrary, the state maintains that drugs were an integral part of Mr. Nash's murder.
In his motion for discovery, the defendant requested, pursuant to La.C.Cr.P. art. 720, notice of "the State's intent to offer evidence of the commission of any other crime admissible under the authority of R.S. 15:446, which offenses or crimes are not part of the res gestae of this offense."[6] In response, the state indicated that it did not intend to offer evidence of "any other crime" which offenses or crimes were not part of the res gestae of the offense. However, the state asserted that, in the event it elected to use any other crime evidence, it would so advise the defendant on a timely basis. Consequently, the court did not conduct a hearing to determine the admissibility of any other crimes evidence under La. C.E. art. 404(B)(1). This court has held that, by giving such an advisement, the state waives its right to use such evidence at trial in its case-in-chief to prove motive, opportunity, intent, etc. State v. Powell, 28,788 (La.App.2d Cir.11/01/96), 683 So.2d 1281, 1288, writ denied, 97-0092 (La.5/30/97), 694 So.2d 243. No hearing is required for other crimes evidence which constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404(B)(1).
At trial, there were several references to the defendant's sale of crack cocaine. During Bernard Johnson's testimony, he stated that immediately after arriving in Newellton, he and Ms. Bradford smoked crack cocaine at her trailer. After exhausting their supply of cocaine, he approached the defendant who sold him some crack. The defense moved for mistrial; however, the trial court agreed with the state's argument that the evidence constituted part of the res gestae.
Gwen Butler, the daughter of the victim and the wife of convicted co-defendant Charles Butler, testified that she knew the defendant as "the crack man from Tallulah." This statement was met by a defense motion for mistrial. The trial court denied the motion but ruled that it was other crimes evidence based on the defendant's reputation. The trial court admonished the jury to disregard the remark.
The state argues that the "drug use" in this case was an integral part of the murder itself. In support of that conclusion, the state urges that the evidence showed "that this was a murder for `drug money'" and that the drug evidence "was necessary to establish that the defendant was a drug supplier, not to case [sic] him in a bad light, but to corroborate the testimony of witnesses *166 and provide a motive for Mr. Nash's murder."
In State v. Brewington, 601 So.2d 656, 657 (La.1992), the supreme court stated:
This court has approved the admission of other crimes evidence when it is related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it. State v. Boyd, 359 So.2d 931, 942 (La.1978); State v. Clift, 339 So.2d 755, 760 (La.1976). In such cases, the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. McCormick, Law of Evidence 448 (2d ed.1972). The concomitant other crimes do not affect the accused's character, because they were done, if at all, as parts of a whole; therefore, the trier of fact will attribute all of the criminal conduct to the defendant or none of it. And, because of the close connection in time and location, the defendant is unlikely to be unfairly surprised. 1 Wigmore, Evidence Sec. 218 (3d ed.1940). State v. Haarala, 398 So.2d 1093, 1097 (La.1981).
In the words of the authors of the Handbook on Louisiana Evidence Law:
The emphasis here should be on whether the other crime, wrong or act is "part and parcel" of the crime charged, and is not really being offered for the purpose of showing that the accused is a person of bad character.
See Handbook, supra, pg. 311.
The trial court correctly ruled that Mrs. Butler's testimony about the defendant's reputation as "the crack man from Tallulah" was not an integral part of this offense. The court also correctly admonished the jury to disregard this evidence.
The erroneous introduction of other crimes evidence is subject to harmless error analysis. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94; reconsideration denied, 94-1379 (La.4/8/96), 671 So.2d 332; State v. Barnes, 28,835 (La.App.2d Cir.12/11/96), 685 So.2d 1148, writ denied, 97-0274 (La.10/10/97), 703 So.2d 602. The appropriate inquiry is whether the verdict actually rendered was surely unattributable to the error.
The trial court ruled that the defendant's sale of crack to Bernard Johnson prior to the murder was an integral part of the murder. We find that the introduction of this transaction, even if error, was harmless beyond a reasonable doubt. The gist of the state's case was that Charles Butler was engaged in a search for money to buy drugs from the defendant when the men robbed and killed Mr. Nash.
The jury heard admissible evidence from Terrance Gales that Butler was looking to buy crack cocaine at about 6:00 p.m. on the evening of the murder. Tyrone Gales testified that he assumed that the defendant had crack to sell but that he never actually saw the defendant sell drugs that night. Claudine Bradford testified that she had bought crack from the defendant in the past and that the defendant "cut up" crack cocaine at her house around 6:00 p.m. or 6:30 p.m. on the evening of the murder. Terrance Gales testified that later that evening, between 8:00 and 8:40 p.m., Butler was still looking for crack and that Butler asked him if the defendant was "doing anything," meaning did the defendant have any crack. Gales testified that he saw the defendant and Butler talking immediately thereafter. When Butler, the defendant and the others arrived at Ms. Bradford's house after the murder, Ms. Bradford saw Butler in possession of crack cocaine. (She did not, however, see the defendant with any crack at that time.) All of this evidence tends to show that Butler got crack cocaine from the defendant and that this transaction was an integral part of this robbery/murder.
Therefore, even if the defendant's sale of crack to Johnson was erroneously introduced, there was ample admissible evidence that (1) the defendant was a drug dealer and (2) he was connected to Butler and this crime through the sale of crack cocaine. The defendant suffered no prejudice from this additional act. Furthermore, contrary to the defense's contention, the prosecutor *167 was entitled to refer to the defendant's drug sales during closing argument.
This assignment of error is without merit.

INDIGENCY STATUS
The defendant was arrested for this crime on November 16, 1995. The defendant appeared at arraignment on January 25, 1996, with retained counsel and pled not guilty. On March 11, 1996, retained counsel filed a motion on behalf of the defendant to have the defendant declared indigent. The motion asserted that the defendant's family paid for the services of his attorney but that the defendant had no way of paying for "other services" needed to assist his attorney in preparing for the case.
The minutes of court reflect that on April 22, 1996, the trial court held a hearing on the motion and took the matter under advisement. The record contains no transcript of this hearing. Further, the record reflects no ruling from the trial court on the motion. In brief, defendant asserted that "From time to time the defendant reminded the court, the court would not go ahead and find the defendant indigent." The state indicated in brief that the defendant's motion was denied.
On appeal, the defendant argues that the trial court should have found him indigent in order for him to obtain an investigator, experts, and other assistance. The state argues that the defendant was not indigent and that even if he were, he failed to show why outside assistance was necessary for his case.
La. R.S. 15:147 provides that the preliminary determination of a defendant's indigency shall be made no later than arraignment. The court minutes do not reflect that any particular determination was made at or before arraignment; however, as noted, the defendant appeared with retained counsel.
Again this record presents a defense motion on which the trial court failed to rule and to which failure the defendant did not object. The question of whether experts should have been provided to a defendant who is unable to afford the services of an investigator, expert, or other outside assistance for his defense is governed by State v. Touchet, 93-2839 (La.9/6/94), 642 So.2d 1213.
In Touchet, the supreme court set out a framework within which an indigent defendant may seek "the basic tools for an adequate defense," including expert assistance. The Touchet court said:
Henceforth, for an indigent defendant to be granted the services of an expert at the expense of the state, he must establish that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, a defendant must ordinarily establish, with a reasonable degree of specificity, that the assistance is required to answer a substantial issue or question that is raised by the prosecution's case or to support a critical element of the defense. If the trial court finds that the indigent defendant is able to meet this standard, it is to authorize the hiring of the expert at the expense of the state.
642 So.2d at 1216.
The defendant's motion "to be declared indigent" did not specify for what purpose he required the various outside services he sought. In brief, the defendant contends that the witnesses at the indigency hearing testified as to his indigence but does not assert that he specified to the trial court what services were needed and why. The defendant did not go to trial for more than a year after the hearing on his motion, and the record fails to show that the defendant followed the Touchet procedures to prove that any type of expert assistance would be necessary to the construction of an effective defense. Touchet, 642 So.2d at 1215.
Therefore, on this record, there is no showing that the defendant was prejudiced by the trial court's treatment of his motion to be declared indigent. This assignment of error is without merit.

IN-COURT IDENTIFICATION
The defendant complains that Tyrone Gales, Chris Jackson and Claudine Bradford identified him as a participant in this crime *168 only because he was seated at the defense table and was the person being tried for this offense. The defendant filed a pretrial motion to suppress, which included identification evidence. The minutes reflect that the motion to suppress was denied; however, the minutes show that none of the complained-of eyewitnesses testified at the hearing. The defendant did not object to Bradford's or Jackson's in-court identification at trial but, after Tyrone Gales had testified extensively, the defendant objected to Gales' identification.
In cases where a defendant asserts that he was not the person who committed the crime, the rationale of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Long, 408 So.2d 1221 (La. 1982); State v. Davis, 27,961 (La.App.2d Cir. 4/8/96), 672 So.2d 428, writ denied, 97-0383 (La.10/31/97), 703 So.2d 12. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding. State v. Ford, 28,724 (La.App.2d Cir.10/30/96), 682 So.2d 847.
Neither Jackson nor Gales identified the defendant at a pretrial proceeding. There is no evidence that the defendant sought to test the witness' identifications in a pretrial lineup. An accused has no constitutional or statutory right to a lineup. State v. Boettcher, 338 So.2d 1356, 1359 (La.1976). The absence of a pretrial identification goes to the weight of the witness' testimony, not to its admissibility. Boettcher, 338 So.2d at 1359-1360.
In State v. Johnson, 343 So.2d 155, 160 (La.1977), the supreme court said:
More persuasive is defendant's argument that the in-court identification procedure was suggestive. He claims that `the mere occupation of the defendant's chair at the counsel table has identifying properties strongly suggesting to the witness that the person occupying that position is the perpetrator of the crime.' It is true that the conspicuous display of the defendant alone in the accusatorial spotlight might dispel the doubts of some uncertain witnesses. However, ` ... this circumstance does not indicate or unduly suggest to the witness that defendant committed the crime, only that he is charged with its commission.' State v. Daniels, 326 So.2d 340, 343 (La.1976). In Daniels, supra, and State v. Brooks, 294 So.2d 503 (La.1974), the court suggested that counsel's right to cross-examine and question the weight to be given identification testimony was sufficient to remedy any suggestion inherent in the incourt identification process. State v. Boettcher, 338 So.2d 1356 (La.1976).
The opportunity to cross-examine a witness about his in-court identification of the defendant as the perpetrator of a crime will ordinarily cure any suggestiveness in an in-court identification. State v. Drew, 360 So.2d 500, 516 (La.1978); State v. Buie, 477 So.2d 157, 162 (La.App. 1st Cir.1985).
Even if an identification procedure is suggestive, the identification will be admissible if, under the totality of the circumstances, it is found to be reliable. State v. Davis, 550 So.2d 774 (La.App. 2d Cir. 1989). Reliability is the linchpin for determining the admissibility of identification testimony. State v. Toney, 26,711 (La.App.2d Cir.3/1/95), 651 So.2d 387. Several factors are used to determine, from the totality of the circumstances, whether the reliability of an identification outweighs the suggestiveness of the procedure employed and presents a substantial likelihood of misidentification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Martin, 595 So.2d 592, 595 (La.1992).
The defendant had ample opportunity to cross-examine both Jackson and Gales regarding their identification of the defendant. On cross-examination, the defendant made the jury aware of the various factors *169 bearing upon the reliability of the witness' identification. However, despite the lapse in time between the event and the trial, both witnesses were certain that the person they saw on the night of the murder was the defendant. Gales knew the defendant, by his nickname, from seeing him "off and on" around Tallulah. Jackson had no doubt that the defendant was the person in his car on the night of the murder and explained a question he directed toward the defendant ("[A]re you Crab?") by indicating that he only knew the defendant's face and nickname but not the defendant's given name.
Ms. Bradford testified that police showed her a single photograph of the defendant and she identified him from that photo. While single photograph identifications should be viewed with general suspicion, their suggestive nature will not per se preclude admissibility unless found to be untrustworthy under the total circumstances. Martin, supra. Ms. Bradford said that she had met Wafer twice prior to the evening of the murder and knew what he looked like.
Under the Brathwaite factors presented during the testimony of these witnesses, we find that the defendant's identity as the person referred to by the witnesses as "Crab" was never in serious question. The defendant was recognized as Crab by many witnesses who placed him in Newellton on the night of the murder; neither Tyrone Gales nor Claudine Bradford testified that the defendant was not the person they knew as Crab. Identification can be inferred from all the facts and circumstances that are in evidence. State v. Amato, 96-0606 (La.App. 1st Cir.6/30/97), 698 So.2d 972, writs denied, 97-2626 & 97-2644 (La.2/20/98), 709 So.2d 772. From the circumstances summarized in the facts, there was no possibility of misidentification in this case.
This assignment of error is without merit.

CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Butler was convicted of second degree murder in May 1997; he did not testify at the trial of the defendant in the instant case.
[2] We note that Mr. Wilmore's first name is spelled a variety of different ways throughout the records, including "Thorneial," "Thonieal" and "Thornieal."
[3] The state presented evidence that the defendant's mother contacted Claudine Bradford during the trial and spoke to her about her testimony. At the conclusion of the trial, the defendant's mother was held in contempt of court and fined for this conduct.
[4] Ms. Sims was not a witness at this trial. In the absence of any evidence pertaining to her prior statements and because she did not testify at trial, this court cannot properly review on appeal any alleged error in the non-disclosure of her statements.
[5] In support of the harmlessness of this complained-of statement, we note that the state had already made almost the identical comment about the same witness without any objection by the defense.
[6] La. R.S. 15:446 was repealed by Acts 1988, No. 515 § 8, effective January 1, 1989; it was replaced by La. C.E. art. 404(B)(1).