804 So.2d 141 (2001)
STATE of Louisiana, Appellee,
v.
Frederick GOLDSTON, Appellant.
No. 35,271-KA.
Court of Appeal of Louisiana, Second Circuit.
December 5, 2001.
Rehearing Denied January 17, 2002.
*145 Louis G. Scott, Charles L. Kincade, Monroe, Counsel for Appellant.
Richard P. Ieyoub, Attorney General, Jerry L. Jones, District Attorney, George D. Ross, Assistant District Attorney, Counsel for Appellee.
Before WILLIAMS, STEWART and DREW, JJ.
WILLIAMS, Judge.
The defendant, Frederick Goldston, appeals his conviction of second degree murder, a violation of LSA R.S. 14:30.1, and his sentence to life imprisonment without benefit of probation, parole or suspension of sentence. For the reasons set forth below, we affirm the defendant's conviction and sentence.

FACTS
On April 7, 1998, the victim, David Gossett, left work at the Piccadilly Cafeteria in Ouachita Parish for his lunch break. His gunshot-riddled body was discovered later that evening on a farm road, and his red truck was found behind the Parkview Apartments. A couple of months later, the defendant gave a recorded statement. In June 1998, the defendant was charged with the second degree murder of David Gossett. After a jury trial, the defendant was convicted as charged and was sentenced to life imprisonment without the benefit of probation, parole or suspension of sentence.

Investigation and facts developed at trial:
At the time of the crime, the victim, David, worked at Piccadilly Cafeteria for his father, Louis Gossett, who was the manager. According to Louis, David's usual work day began about 11:00 a.m. and ended about 9:00 p.m. David took his lunch break from 3:30 until 5:00 p.m. Eric Bursey worked with David at Piccadilly. Eric related that he and David usually played pool at the Get-a-way Video Poker Room ("Get-a-way") at 3:30 p.m. during David's lunch break. According to Eric, David usually stopped at the gas station on the way and bought a snack to eat while they played pool. On the day he was murdered, David worked his usual shift at Piccadilly and left for his lunch break at 3:30 p.m. David asked Eric if he would go with him to play pool during lunch. Eric declined, however, because his wife needed his help at home. Eric walked out of the Piccadilly with David at 3:35 p.m. and saw David walk alone toward his truck.
Voyce Richards worked at the Get-away on Sterlington Road. Voyce and David were close friends, and she was very familiar with his truck. Voyce related that David would arrive at the Get-a-way every day by 4:15 p.m. and play pool. On April 7, 1998, a few minutes before 4:00 p.m., Voyce looked through the glass door and saw David drive his truck directly in front of the door, and then immediately drive away. David had a black male passenger with him who was about David's height. It was not unusual for David to have friends with him, and Voyce thought David might be giving someone he worked with a ride home.
At about 4:10 p.m., Laura Landers Adams, one of David's co-workers at Piccadilly, was driving on Curry and Sherrouse Streets when she saw David in his truck with a black male passenger. Laura didn't recognize the passenger, who had dark *146 skin, was about David's height, and was wearing a white shirt. David waved at Laura, and she wondered what David was doing in "Booker T," a high crime area. Later, at about 4:45 p.m., Laura again saw David's truck, but could not see who was driving. The truck was on Thomas at Georgia Street, near her house. The person driving the truck was driving recklessly and ran a stop sign. Laura thought that David was too far from Piccadilly at that time to return from his lunch break on time.
Angie Smith, who was also one of David's co-workers, was driving on Powell Street between 3:30 and 4:30 p.m. when she saw David drive his truck out of a nearby recreational center. Angie noticed that David's passenger was a black male. Also, another co-worker, Cynthia Cooper, saw David's truck at 4:45 p.m. on Georgia Street, and observed that he would be late getting back to work. She could not see how many people were in the truck, or who was driving.
At approximately 4:30 p.m., as it was getting dark, Carrie Pierce saw a person she knew as "Little Freddie" at the Parkview Apartments. Little Freddie and his companion, Jerry, were driving around in a red truck. Pierce testified that she and her children were visiting her girlfriend, Denise, at the Parkview Apartments when Little Freddie and Jerry ran inside Denise's apartment and asked for a tee-shirt. One of the men told Denise to tell Pierce and the kids to leave the room, but Pierce tiptoed back and listened to everything that was said. Pierce overheard the men tell Denise that they killed "this white boy". Little Freddie was covered in blood, and Pierce saw that Little Freddie had a mark, cut or wound on his shoulder as he changed shirts. Pierce saw Jerry with a white bag, which he threw into a nearby field as he walked on a trail from Robinson Place to Parkview Apartments. She then saw Jerry pick up a shotgun from the ground as he went back through the trail. Little Freddie and Jerry left the apartments in the truck.
When David did not return from lunch at 5:00 p.m., his father became worried and left Piccadilly to look for his son. He searched for David from 6:00 until approximately 8:30 p.m. Meanwhile, late that afternoon, Kenneth Anderson had been working on his farm in the area called Bosco in Ouachita Parish. While traveling in and out of Mansfield Road, a horseshoeshaped public road on Highway 165 that runs through his farm, he discovered a severely traumatized body on the side of the road. Anderson called 911 from his cell phone. Anderson stated that he and his farm workers are the only people who use the road. The only buildings located on the road are his home, farm headquarters, shop, sheds, grain bin, seed-sacking business and an abandoned school. Anderson's farm workers were all working on another farm up the road when Anderson discovered the body.
Monroe Hilton, a deputy sheriff for Ouachita Parish, was a member of the crime scene team that investigated David's murder. According to Hilton, Anderson's call was logged in at approximately 6:00 p.m. The crime scene was undisturbed when they arrived. The victim, who was later identified as David, appeared to have been shot. Photographs of his body were taken by the investigating officers. Evidence of trauma was found a distance away from his body, including two bloody human teeth and a trail and pool of blood. A Delta Mini Mart receipt was found in David's pants pocket reflecting his Exxon credit card purchase on April 7, 1998 at 3:41 p.m. for miscellaneous merchandise totaling $3.66. A plastic shotgun wad was found in a ditch about 14 feet from David's *147 body. Fresh tire tracks were found in the circular gravel driveway of the old school building, located approximately two-tenths of a mile from where David's body was found. Plaster casts were made of the tire prints, but the tires were not matched to any particular vehicle. The school driveway was located on Mansfield Road approximately four-tenths of a mile from one of the intersections of Mansfield Road and Highway 165. There were no tire indentations found on Mansfield Road because it was made of a rigid pea gravel and blacktop mixture. Near David's body, the grass on the side of the road was flattened down as if someone's vehicle ran off the road for a short distance.
At approximately 6:30 p.m. on the evening of the murder, Pierce saw David's truck return to the Parkview Apartments, and saw Little Freddie "doing donuts on the grass, going crazy driving the truck". Later on the night of the murder, Lieutenant Jay Via arrived at the cafeteria to tell Louis of David's death. About 9:30 p.m., David's unlocked truck was found on a back road leading to the Parkview Apartments, just off Highway 165 South. Photographs were made of the truck, and officers found some small gouge marks in the paint on the side of the truck. Also, the officers observed some dark brown material on the side of the truck that looked like blood, but tested negative for blood in later tests. Neither a weapon nor ammunition was found in David's truck. The officers secured the truck until the wrecker arrived sometime after midnight. Thirty-nine latent finger and palm prints were lifted from the truck, none of which matched the finger and palm prints of the defendant.
Dr. Timothy Hayne, an expert in forensic pathology, performed an autopsy on the victim. There were three significant shotgun wounds. The immediately lethal wound was located on the right side of the forehead, which produced massive injuries to the skull and brain. Of the two other wounds, the one to the left temple, which also produced pellet wounds to the upper chest, was potentially lethal. The third wound was a potentially lethal contact gunshot wound to the chin, which produced massive injury to the chin. Dr. Hayne concluded that the contact gunshot wound to the chin was inflicted first. This gunshot would have caused significant blood spatters (blow back) to the victim's right side, onto the shooter and on anyone within approximately 10 feet of the victim. It also would have caused a shower of small blood droplets slightly behind the victim. The blood droplets on the victim's pants leg indicated that the victim was standing when he received the contact gunshot wound to his chin. The other two gunshots were fired from a distance much greater than five or six feet away. Dr. Hayne could not exclude the possibility that the wounds were inflicted by two or three different shotguns.

In-court identification:
At trial, Pierce identified the defendant as the person she knew as "Little Freddie" by pointing in his direction, and identified a picture of David's truck as the truck she saw the defendant in on the night of the murder. On cross-examination, Pierce was adamant that the defendant was the Little Freddie she saw on the night of the murder. She stated that she knew where he lived and that she had seen him on previous occasions while he was visiting at the Parkview Apartments.

Out-of-court identification:
Lieutenant Via testified at trial that during the course of the investigation, he spoke with Pierce on approximately three occasions. Pierce gave a recorded statement to the police on April 21, 1998, and again in April 2000. During the first *148 statement, Pierce described Little Freddie's clothing (white tank top and long black or blue shorts), and that he had a mouth full of gold teeth. Pierce was shown a composite drawing of the defendant, which she stated looked like Little Freddie, but suggested some modifications to the drawing regarding the nose and/or eyes. Pierce also told police that Little Freddie had a cross tattooed on his face, and a mark on his shoulder. Several days after Pierce's first statement in April 1998, Lieutenant Via also spoke with Pierce while he was in the Parkview area. This was not a structured interview, but Pierce was asked a series of questions. After the defendant's arrest in June 1998, Pierce was shown a single photograph of the defendant. When asked, "Do you know who this is?", Pierce identified the person as Little Freddie. In Pierce's April 2000 statement, she gave information only about Jerry.
At trial, Pierce admitted on cross-examination that the defendant did not have a cross tattooed on his face. Pierce stated that she did not remember telling Lieutenant Via during the April 1998 statement that Little Freddie had "Little Freddie" tattooed on his right knuckles. The defendant displayed his right knuckles, and Pierce admitted that the defendant did not have "Little Freddie" tattooed on his right knuckles. Later, Pierce asserted that the Little Freddie she knew, and identified as the defendant at trial, did have "Little Freddie" tattooed on his right knuckles, and must have gotten the tattoo removed. The trial transcript does not definitively show whether the defendant had a mark on his upper neck or shoulder. The defendant also displayed his teeth at trial, and verified the accuracy of Pierce's statement regarding his gold teeth. The defense pointed out some inconsistencies between Pierce's statements and her trial testimony, including the fact that she told police that only one person, Jerry, was in the truck when she saw it at the apartments. Pierce stated that she probably did not understand the question. Pierce also stated that during one of her statements, she was shown a line-up and identified a picture of the defendant as Little Freddie. However, Lieutenant Via stated that he never showed Pierce a lineup containing the defendant's picture. He showed her a lineup containing a picture of Jerry Harris, whom she identified as the same Jerry she saw on the night of the crime. She further admitted that she did not know Little Freddie's full name until after she called her girlfriend, who told her that Little Freddie's last name was Goldston. Pierce also testified that she took Dilantin and Phenobarbital, which she admitted affected her memory.

Defendant's recorded statement:
Lieutenant Via testified at trial that an anonymous tip from Crime Stoppers indicated that the defendant was the "Little Freddie" who was involved in the instant murder. The defendant, who went by the name "Little Freddie," voluntarily accompanied police officers to the annex for questioning on June 2, 1998. Before any questioning or statement, the officers determined that the defendant could read, write and understand the English language and was not under the influence of any intoxicants. The officers explained to the defendant his Miranda rights, which he stated that he understood and voluntarily waived. The defendant signed the waiver of rights form before Lieutenant Via, Sergeant Lenard and Sergeant Brooks. No threats, inducements or promises were made to the defendant at any time. The defendant's recorded statement was played for the jury at trial.
While taking the statement, Lieutenant Via showed the defendant a picture of *149 David, and a picture of his red truck. The defendant initially denied knowing David, but positively identified the truck. However, the defendant later stated that he was "almost 100 percent sure" that he "rented" the red truck for $50.00 from the man in the picture at about 7:00 or 7:30 p.m. on the evening of the murder. He stated that David approached him in "Booker T" about renting his truck, and at first he refused. Then a few minutes later the defendant decided he would rent the truck, and dropped David off at a motel. First, the defendant drove David's truck to the Parkview Apartments and talked with Jerry, and then he drove to his grandmother's house to bathe and change clothes. The defendant changed from his white tee shirt and black pants into shorts and a blue and white striped shirt. The defendant took the truck out again and encountered Jerry at the Parkview Apartments. The defendant stated that he then rented David's truck to Jerry, and never saw the truck again that night. When questioned about certain streets on which he drove the truck, the defendant admitted being on some of the same streets which were described by witnesses who saw David's truck on the evening of the murder.
Lieutenant Via stated at trial that no other person named "Little Freddie" or "Little Fred" admitted being in David's truck on the evening of the murder. Also, the route the defendant described as having traveled in the truck coincided with the route previously described by several trial witnesses. Lieutenant Via also stated that it would have been impossible for the defendant to "rent" the truck from David at 7:00 or 7:30 p.m. because David was already dead by that time, his body having been discovered at approximately 5:45 p.m. that evening.

Lieutenant Via's expert trial testimony:
After questioning by the state and the defendant at trial, Lieutenant Via was qualified as an expert in the field of homicide crime scene investigations and allowed to express opinions in that field. Lieutenant Via then presented a time-line which was developed during the course of the investigation. It was determined that David left work at the Piccadilly alone between 3:30 and 3:40 p.m. A black male passenger entered his vehicle, and then they traveled eastbound to the Delta Mini Mart, located on the corner of Washington and Louisville, where David went in and purchased several items (two drinks and two packs of cigarettes) at 3:45 p.m. David then drove up to the Get-a-way with a black male passenger, but pulled out again. David was then seen at the intersection of Curry and Sherrouse Streets, southbound toward Milhaven Road, and again at the intersection of Matthew Street and Powell Avenue somewhere between 4:10 and 6:10 p.m. The next time David's truck was spotted it was being driven erratically in the vicinity of Thomas and Georgia Streets in south Monroe, heading south. The abandoned truck was later found at the Parkview Apartments.
Lieutenant Via gave his expert opinion regarding the crime scene scenario. Lieutenant Via stated that David was apparently first shot from the right while standing up in the middle of the roadway near the driver's side of his truck. David then tried to flee in an easterly direction and fell on his back, where two more rounds were fired into his body (one from the right and one from the left). Lieutenant Via believed that there were two assailants involved, who fled in David's truck. On cross-examination, Lieutenant Via explained that it is a common practice for drug dealers to "rent" a vehicle to use in drug-related activities so that the vehicle *150 cannot be traced back to them. He also stated that he learned from his investigation that the victim would give rides to people, but would not have rented or given his truck to anyone.

Trial defense witnesses:
At trial, the defense called Thomas Britton, a construction worker who was working near the Parkview Apartments at the time of the murder. Britton testified that about 5:00 p.m. on the evening of the murder, he saw a black male driving a red truck pull up behind the Parkview Apartments. The man left the truck running and the door slightly ajar, and entered the apartment area through a hole in the wrought iron fence. Britton described the man as medium build, about 5'9" to 5'10" tall, and with lighter skin than the defendant.
The defendant's grandmother, Essie Butler, testified on behalf of the defendant. Butler stated that the defendant stayed with her some during April 1998, and she never observed him with a shotgun. Butler also stated that, to her knowledge, he was called "Freddie," but not "Little Freddie." She also stated that he did not have any tattoos at the time he was arrested. Sandra Goldston, the defendant's mother, also testified that the defendant stayed with both her and his grandmother at the time he was arrested. She denied ever having any guns in the house, and asserted that the defendant went by "Frederick," not "Little Freddie." The defendant's mother also stated that the defendant did not have any tattoos at the time of his arrest. Furthermore, she testified that a day or two before she heard of David's murder, she saw a white man in the red truck at the Parkview Apartments. The white man was surrounded by four black men, including Eugene Jones. The defense introduced several exhibits into evidence, including the victim's wallet, the tire cast impressions, substances vacuumed from the truck, contents from dashboard, contents of glove box, contents of ashtray, glass fragments from passenger side running board, and a warrant for Eugene Jones.
The defense also presented Donald Abney as a witness. Abney was working at the Exxon gas station on the day David was murdered. David was a regular customer, and he remembered that David entered the store quickly and purchased a couple of items. David's truck was parked in his right peripheral vision, and he saw that David had two persons in the truck with him-a black male and a black female. The black male's hair was platted-braided close to the head in rows. On cross-examination, Abney reviewed a prior recorded statement given to Lieutenant Via in which he only described a black male in the truck, and described the black male as having on a white tee-shirt. Lieutenant Via testified that Abney did not mention a black female passenger during his interview.

DISCUSSION

Sufficiency of the evidence:
The defendant argues in his first assignment of error that the state presented no evidence that he directly or indirectly committed the offense, or that he had the specific intent to kill or inflict great bodily harm. The defendant also asserts that the state's witnesses were not credible. Furthermore, the defendant contends that the state did not meet its burden of negating any reasonable possibility of misidentification when the defendant remains silent.

Applicable law:
The question of sufficiency of the evidence is properly raised by a motion for post-verdict judgment of acquittal. LSA C.Cr.P. art. 821; State v. Gay, 29,434 *151 (La.App.2d Cir. 06/18/97), 697 So.2d 642. The record shows that the defendant properly raised the issue of sufficiency of the evidence in the trial court in a motion for post-verdict judgment of acquittal, which was denied by the trial court.
When issues are raised on appeal, both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333. Under Jackson v. Virginia, supra, the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bosley, supra; State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992). The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
When the defendant claims that he is not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Hunter, 33,066 (La.App.2d Cir.9/27/00), 768 So.2d 687; State v. Powell, 27,959 (La.App.2d Cir.04/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.02/21/97), 688 So.2d 520.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson, supra, and does not extend to credibility determinations made by the trier of fact. LSA Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir.05/08/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.06/26/98), 719 So.2d 1048.
Second degree murder is defined, in pertinent part, as "the killing of a human being when the offender has a specific intent to kill or to inflict great bodily *152 harm." LSA-R.S. 14:30.1.[1] Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act. LSA R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. McCray, 621 So.2d 94 (La.App. 2d Cir. 1993). Specific intent need not be proven as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Doby, 540 So.2d 1008 (La.App. 2d Cir. 1989), writ denied, 544 So.2d 398 (La. 1989).
The defendant's act of pointing a gun at the victim's head while firing it is evidence from which a reasonable person could conclude that he had a specific intent to kill. State v. Robinson, 32,794 (La. App.2d Cir.3/1/00), 754 So.2d 311; State v. Guy, 95-0899 (La.App. 4th Cir.1/31/96), 669 So.2d 517, writ denied, 96-0388 (La.9/13/96), 679 So.2d 102. In State v. Stringfellow, 28,074 (La.App.2d Cir.5/8/96), 674 So.2d 1036, this court stated that the firing of buckshot from a shotgun at fairly close range was alone sufficient evidence of specific intent to kill or inflict great bodily harm for a second degree murder conviction.
LSA-R.S. 14:24, defines the term "principal," as follows:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

Application of law to facts:
Since issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, this court will first determine the sufficiency of the evidence. Hudson v. Louisiana, supra. In this case, the defendant claims that he is not the person who committed the crime. Therefore, under the Jackson rationale, the state must negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Hunter, supra; State v. Powell, supra.
The defendant's identity as a perpetrator was not proven by physical evidence or direct evidence other than the testimony given by Pierce. However, the defendant's own recorded statement, given freely and voluntarily, placed him with David in his truck on the evening of the murder, wearing the white shirt described by other witnesses, at an impossible time and in an unlikely situation. That is, the defendant stated that he rented David's truck during a time period after which David's dead body had already been discovered. Also, the defendant's story that he "rented" the truck from David was disputed by direct evidence in the form of testimony by David's family and friends that his truck was his pride and joy, and that he would never give rides to someone he didn't know or hadn't been introduced to by a friend. It was Lieutenant Via's expert opinion, based upon his investigation of this crime, that David would not have given his truck to anyone to drive. Also, the route the defendant described in his statement as having traveled in the truck coincided with the route previously described by several trial witnesses.
*153 The defendant's involvement in David's murder was greatly bolstered by Pierce's trial testimony. Pierce saw the defendant in David's truck on the night of the murder (at about 4:30 p.m.) between the time David was last seen alive (from 4:10 to 4:30 p.m.) and the time his dead body was discovered (at about 6:00 p.m.). Pierce's testimony also placed the defendant in David's truck at the location where the truck was found later that night, at the Parkview Apartments. Pierce's description of the defendant's dress (a white shirt), corroborated the defendant's own description of the clothing he wore that night. The fact that Pierce stated that the defendant was covered in blood further corroborated the forensic expert trial testimony that the shooter of the contact wound, or anyone within close range of the shooter, would have gotten "blow back" on their person and clothing. Finally Pierce's statement that she heard Little Freddie and Jerry telling her girlfriend that they killed "this white boy" solidified the defendant's role in David's death. Pierce's testimony regarding these facts does not contain any internal contradiction or irreconcilable conflict with physical evidence. Therefore, the testimony of this one witness, obviously believed by the trier of fact, can be considered sufficient support for a requisite factual conclusion. State v. White, supra. The inconsistencies between Pierce's trial testimony and prior recorded statements regarding the crime were evidently considered by the jury in its credibility determination. The jury's decision to "accept or reject the testimony of a witness in whole or in part should be given great deference." (emphasis added). State v. Bosley, supra. Thus, the state met its burden of negating any reasonable probability of misidentification, and carried its burden of proof in this case in accord with State v. Hunter, supra and State v. Powell, supra. Considering all of the evidence presented, resolving any conflict in the direct evidence by viewing it in the light most favorable to the prosecution, and considering that the facts can be inferred from the circumstantial evidence, the defendant's identity as a principal in this murder can be concluded beyond a reasonable doubt. State v. Sutton, supra, State v. Owens, supra.
The evidence presented at trial regarding the specific intent to kill or cause great bodily harm is clearly sufficient to support a conviction of second degree murder in the case sub judice. Expert forensic testimony showed that David received two potentially lethal shotgun blasts and one immediately lethal shotgun blast to his head. One of the potentially lethal shotgun blasts was inflicted at the extremely close range of a contact wound to the head. This evidence of the firing of buckshot from a shotgun at such close range was alone sufficient evidence of specific intent to kill or inflict great bodily harm for a second degree murder conviction. See State v. Robinson, supra; State v. Stringfellow, supra.
Therefore, when viewed in the light most favorable to the prosecution, the evidence was sufficient to conclude that all of the elements of the second degree murder were proved beyond a reasonable doubt. State v. Hearold, supra; State v. Bosley, supra. Thus, this assignment of error is without merit.

Failure to suppress Pierce's in-court identification:
The defendant assigns as error the trial court's failure to suppress the in-court identification of the defendant by Carrie Pierce. He argues that Pierce's in-court identification should have been suppressed because the circumstances surrounding Pierce's prior statements and prior out-of-court *154 identifications made the in-court identification suggestive.
Prior to trial, the defendant filed a motion to suppress any in-court identification of the defendant by state witness Carrie Pierce. At the hearing on the motion, the defense questioned Lieutenant Via, the investigating officer who interviewed Carrie Pierce. Lieutenant Via stated that he questioned Pierce several times during the course of the investigation and took recorded statements from her in April 1998, and again in April 2000. Lieutenant Via stated that the 1998 interview with Pierce took place at the police office annex. Pierce identified the person she saw in the victim's truck cutting donuts in the ground of Parkview Apartments as "Little Fred" or "Little Freddie," whom she knew from "Booker T." Pierce told Lieutenant Via that she thought Little Freddie had "Little Fred" tattooed on his right knuckles, and a scar or mark on his neck or upper shoulder. At the hearing, the defendant was instructed to display his right knuckles, which did not have "Little Fred" or "Little Freddie" tattooed on them. However, the defendant did have tattoos on his arm. The record of the hearing does not definitively show whether the defendant had a mark on his neck or upper shoulder at the time of the hearing. Lieutenant Via showed Pierce a composite drawing of an individual seen in the area the victim traveled on the day of the crime by other witnesses. Lieutenant Via never showed Pierce a line-up containing the defendant.
The defendant was arrested after the first interview with Pierce. Lieutenant Via showed the defendant's Polaroid arrest photograph to Pierce in an interview subsequent to the defendant's arrest and asked her, "Do you know who this is?" Pierce answered, "That's Little Freddie." During the April 2000 recorded statement, Lieutenant Via did not question Pierce about the defendant. Lieutenant Via admitted that during the course of the investigation he came across approximately 15 persons called "Little Fred," but only one Little Fred placed himself with the victim at the time the crime took place. Thereafter, the trial court denied the motion to suppress the in-court identification, and noted the defendant's objection to its ruling.
The defendant bears the burden of proving both that an out-of-court identification was suggestive, and that there was a substantial likelihood of misidentification as a result of the identification procedure. State v. Ballett, 98-2568 (La.App. 4th Cir.3/15/00), 756 So.2d 587, 597; State v. Martello, 98-2066 (La.App. 4th Cir.11/17/99), 748 So.2d 1192, 1198, writ denied, XXXX-XXXX (La.12/15/00), 777 So.2d 475. To suppress an identification, the defendant must first prove that the identification procedure was suggestive. State v. Prudholm, 446 So.2d 729 (La. 1984). An identification procedure is suggestive if, during the procedure, the witness's attention is unduly focused on the accused. State v. Robinson, 386 So.2d 1374, 1377 (La.1980); State v. Laymon, 97-1520 (La.App. 4th Cir.3/15/00), 756 So.2d 1160, citing State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000); State v. Rodriguez, 98-2574 (La.App. 4th Cir.2/16/00), 753 So.2d 339; State v. Sterling, 96-1390 (La. App. 4th Cir.11/13/96), 684 So.2d 74.
Single photograph identifications are generally viewed by the courts with suspicion. State v. Taylor, 99-1311 (La.1/17/01), 781 So.2d 1205; State v. Harper, 93-2682 (La.11/30/94), 646 So.2d 338. However, their suggestive nature will not per se preclude admissibility unless found to be untrustworthy under the total circumstances. State v. Harper, supra; *155 State v. Martin, 595 So.2d 592 (La.1992); State v. Harris, 28,517 (La.App.2d Cir.8/21/96), 679 So.2d 549, writ denied, 96-2954 (La.9/26/97), 701 So.2d 975; State v. Dyer, 621 So.2d 51 (La.App. 2d Cir. 1993); State v. McCarter, 577 So.2d 816 (La.App. 2d Cir.1991). A photographic identification composed of essentially one photo has been determined to be trustworthy even if suggestive under the facts in State v. Harris, supra, in which the identifying officers clearly saw the defendant at night when he leaned into their car with illumination provided by streetlights, and the photo identification took place an hour after the drug sale. State v. Anderson, 30,306 (La.App.2d Cir.1/21/98), 706 So.2d 598.
Despite the existence of a suggestive pre-trial identification, an in-court identification may be permissible if there does not exist a very substantial likelihood of irreparable misidentification. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Williams, 33,201 (La.App.2d Cir.5/15/00), 758 So.2d 1003, writ denied, XXXX-XXXX (La.4/27/01), 791 So.2d 111. If there is a suggestive identification procedure, the courts must look to several factors to determine, from the totality of the circumstances, whether the suggestive identification presents a substantial likelihood of misidentification. These factors include: (1) the opportunity of the witness to view the criminal at the scene of the crime; (2) the witness's degree of attention; (3) the accuracy of his or her prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Manson v. Brathwaite, supra. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. State v. Williams, supra; State v. Jones, 31,613 (La.App.2d Cir 4/01/99), 733 So.2d 127, writ denied, 99-1185 (La.10/01/99), 748 So.2d 434.
The opportunity to cross-examine a witness about his in-court identification of the defendant as the perpetrator of a crime will ordinarily cure any suggestiveness in an in-court identification. State v. Wafer, 31,078 (La.App.2d Cir.9/23/98), 719 So.2d 156; State v. Buie, 477 So.2d 157, 162 (La.App. 1st Cir.1985). See also State v. Drew, 360 So.2d 500 (La.1978), which found that the fact that the defendant was the only black man seated at the defense counsel's table did not render the victim's in-court identification inadmissible, although such a factor was one to be considered by the jury in weighing the testimony. The court held that the defendant had ample opportunity to extensively cross-examine the victim, a sufficient remedy to any suggestion inherent in the in-court identification process.
See also State v. Martin, 595 So.2d 592 (La.1992), holding that when reviewing a trial court's ruling on a motion to suppress, a reviewing court will consider the entire record, including the testimony presented at trial. State v. Ball, 32,497 (La.App.2d Cir.12/15/99), 748 So.2d 1239.

Application of law to facts:
The fact that Pierce was shown a single photograph of the defendant prior to trial should be viewed with general suspicion because the witness's attention was unduly focused on the accused. State v. Robinson, supra; State v. Laymon, supra. However, the general suggestive nature of this out-of-court identification will not per se preclude admissibility unless the identification is found to be untrustworthy under the total circumstances. State v. Harper, supra; State v. Martin, supra; State v. Harris, supra; State v. Dyer, supra; State v. McCarter, supra. Pierce asserted that she knew Little Freddie prior to the *156 crimeshe knew where he lived and had seen him at the Parkview Apartments on prior occasions. At the time that Pierce was shown the single photograph of the defendant, he had already been arrested for the murder. When Pierce was asked if she knew the person in the photograph, she identified him as Little Freddie. The photograph merely confirmed the information already given by her to police. Under the totality of the circumstances, this out-of-court identification was not untrustworthy, and therefore, its generally suggestive nature does not per se preclude its admissibility. State v. Harper, supra; State v. Martin, supra; State v. Harris, supra; State v. Dyer, supra; State v. McCarter, supra.
Despite the existence of any suggestive pre-trial identification, Pierce's in-court identification was permissible because there did not exist a very substantial likelihood of irreparable misidentification. Manson v. Brathwaite, supra; State v. Williams, supra. A review of this assignment in light of the Manson factors reveals that: (1) Pierce had the opportunity to view the defendant when he entered Denise's house and was in the same room with him until she and her kids were asked to leave the room. The opportunity was sufficient for Pierce to remember and later describe the defendant, his blood-stained clothing, and his actions in asking for a clean shirt and changing into another shirt; (2) Pierce's degree of attention during the event was great, as illustrated by the fact that she intentionally tiptoed back to listen to what was being said. Pierce listened closely enough that she later was able to quote the defendant's words; (3) The accuracy of Pierce's prior descriptions of the criminal was variedher description of the defendant's tattoos on his face and knuckles proved to be inaccurate, judging from the display and comparison of the defendant's bodily markings at trial. However, her description of his gold teeth was proved accurate. The accuracy of her description of a mark on the defendant's neck or upper shoulder cannot be definitively discerned from the record; (4) The level of certainty demonstrated by Pierce at the confrontation at trial was great. Pierce insisted that she knew Little Freddie and he was the defendant; and (5) The time between the crime and the in-court confrontation was approximately two years, which is not an extraordinarily long lapse of time under these circumstances. Manson v. Brathwaite, supra.
Although the opportunity to view the defendant on the evening of the crime was arguably minimal and some of Pierce's prior descriptions of the defendant were inaccurate, her level of certainty and degree of attention balance these factors. The time between the crime and the confrontation is negligible for a murder trial. Thus, the factors set forth in Manson v. Brathwaite, supra, are satisfied when applied to the instant case. See State v. Williams, supra; State v. Jones, supra.
In any event, the record reflects that the defense had the opportunity to, and did in fact, thoroughly cross-examine Pierce about her in-court identification of the defendant as the perpetrator of the crime. This cross examination cured any suggestiveness found in the instant case. See State v. Drew, supra; State v. Wafer, supra; State v. Buie, supra.
A review of the testimony at trial and during the hearing shows that the defendant did not meet his burden of proving both that the out-of-court identification was suggestive, and that there was a substantial likelihood of misidentification as a result of the identification procedure. Therefore, the trial court did not err in denying the defendant's motion to suppress the in-court identification. State v. *157 Ballett, supra; State v. Martello, supra. This assignment of error is therefore meritless.

Detective Via's qualification as an expert witness:
By this assignment of error, the defendant argues that the case was not complex and no expert testimony was necessary to aid the jury in its determination. Specifically, the defendant contends that Lieutenant Via invaded the province of the jury by telling them how he thought the victim was killed based upon his interpretation of the evidence. He asserts that Lieutenant Via's testimony does not meet the standards set forth in State v. Foret, 628 So.2d 1116 (La.1993).

Facts regarding Via's expert testimony:
During trial, the state questioned Lieutenant Via regarding his qualifications and tendered him as an expert in the field of homicide and crime scene investigation. The defense questioned the witness regarding his qualifications. After the defense finished, the trial court accepted Lieutenant Via as an expert in the field of homicide crime scene investigations and allowed him to express opinions in that field. The defense made no objection to this ruling. However, during Lieutenant Via's testimony, the defense objected to the state's question regarding his opinion as to what occurred when the victim was in the truck and what occurred on Mansfield Road. The defense argued that even an expert is precluded from giving an opinion on the ultimate issue. The state agreed to narrow the scope of the question to allow Lieutenant Via to do a crime scene reconstruction and request his opinion regarding the theory of the homicide. The state then questioned Lieutenant Via regarding the sheriff department's theory regarding how the wounds were inflicted. The defense did not object and thoroughly questioned the witness on cross-examination. The state then asked Lieutenant Via to review the physical evidence which led him to believe that David's truck was on Mansfield Road when the murder occurred. After the narrative, the defense moved to strike Lieutenant Via's last statement based upon the witness's opinion on the ultimate issue of guilt. The trial court denied the motion and agreed to caution the jury regarding its role as the ultimate determiner of guilt.

Applicable law:
It is well-settled that defense counsel must state the basis for an objection when it is made, pointing out the specific error to the trial court. The grounds for objection must be sufficiently brought to the court's attention to allow it the opportunity to make the proper ruling and prevent or cure any error. See LSA-C.E. art. 103 A(1); LSA-C.Cr.P. art. 841; State v. Trahan, 93-1116 (La.App. 1st Cir.5/20/94), 637 So.2d 694. When a defendant fails to object to an issue at trial, he is precluded from urging the issue on appeal. See State v. Leblanc, 618 So.2d 949, 958-59 (La.App. 1st Cir.1993).
Article 704 of the Louisiana Code of Evidence regulates opinion testimony given by experts on an ultimate issue:
Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.
Thus, an expert's opinion in a criminal case is not inadmissible merely because it embraces an ultimate issue to be decided by the jury, except that the expert cannot express an opinion as to the guilt or innocence of the accused. State v. *158 Trahan, supra; State v. Parker, 596 So.2d 315, 320 (La.App. 3d Cir.1992).
In State v. Trahan, supra, the court summarized the cases interpreting this article:
The comments to article 704 indicate the article "clarifies" prior Louisiana law and is in "harmony" with State v. Wheeler, 416 So.2d 78 (La.1982), which decision, according to the comments, "should continue to control." La. C.E. art. 704, comments (a) & (c). See also State v. Raiford, 600 So.2d 924, 928 (La.App. 4th Cir.1992). In Wheeler, the trial court accepted a police officer as an expert in the field of narcotics transactions. The state then presented the expert with a hypothetical set of facts resembling the facts of the case (possession with intent to distribute marijuana) and asked the officer what the likelihood was that the person involved in that hypothetical was involved in the distribution of marijuana. The officer responded that, in his opinion, the person was involved in the distribution of the substance. Finding this testimony "tantamount to an opinion that the defendant was guilty of the crime charged," the Louisiana Supreme Court found error in the court's admission of the evidence and reversed the conviction. 416 So.2d at 81. In doing so, the court said that variables are present in the principles which guide a trial court in deciding whether or not to admit expert witness testimony and that all of the variables weighed heavily against the admission of expert testimony on such matters as how the case should be decided or as to whether or not a defendant is guilty:
The evidence is not truly expert testimony because it relates to matters well within the jury's understanding and is wholly without value to the trier of fact in reaching a decision; the inference or opinion is abstract and indirect; and it relates to an ultimate issue rather than a collateral matter. When an objection is raised to the introduction of an expert's opinion or inference, care should be taken by the trial judge to assess the statement in light of each of the foregoing variables. 416 So.2d at 81. See also State v. Jones, 558 So.2d 546, 551 (La.1990); State v. Montana, 421 So.2d 895, 899 (La.1982). The final sentence of article 704 codifies the position taken by the court in Wheeler, that expert testimony concerning whether or not a defendant is guilty is inadmissible.
Also see State v. Code, 627 So.2d 1373, 1384 (La.1993), in which the Louisiana Supreme Court said "it is reversible error for an expert to testify as to an ultimate issue of the defendant's guilt, even when couched in terms of a hypothetical situation."
In Code, the Louisiana Supreme Court held that error resulting from the improper admission of an expert's opinion concerning the ultimate issue of a defendant's guilt is subject to a harmless error analysis. 627 So.2d at 1384. The court then said that the proper analysis for determining harmless error in such a situation is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." State v. Trahan, supra.

Application of law to facts:
In the instant case, although the defendant objected to the Lieutenant's testimony because it would relate to an ultimate issue to be determined by the jury, he never contested Lieutenant Via's qualifications. Thus, he is barred from raising this issue on appeal. LSA-C.Cr.P. art. *159 841; State v. Trahan, supra. See State v. Leblanc, supra. Therefore, this court need not discuss the trial court's alleged non-compliance with the standards for admission of scientific evidence as per Foret, supra.
However, by its objection, the defense did preserve the issue of whether Lieutenant Via's testimony related to the ultimate issue to be determined by the jury. Lieutenant Via's testimony was not inadmissible merely because it allegedly embraced an ultimate issue to be determined by the jury. LSA-C.E. art. 704; State v. Trahan, supra; State v. Parker, supra.
A review of Lieutenant Via's expert testimony reveals that it was certainly not "tantamount to an opinion that the defendant was guilty of the crime charged." State v. Wheeler, supra; State v. Trahan, supra. Viewed under the variables set forth in Trahan, we do not find that the expert testimony should have been excluded. Lieutenant Via's testimony was not "well within the jury's understanding" and "wholly without value" to the jury in reaching its decision because it put together the complicated scientific facts set forth at trial by the crime scene investigators and the forensic pathologist in a clear and understandable format. Although Lieutenant Via's testimony was direct regarding the prosecution's theory of the circumstances under which the crime took place (including his presentation of scientific and physical evidence and the time line he derived from interviews with witnesses), it did not conclude that the defendant was a principal to the crime, the ultimate issue for the jury's determination in the instant case. Thus, after reviewing the record, we conclude that Lieutenant Via's expert testimony did not relate to whether or not this defendant was guilty, and was properly admitted by the trial court. See State v. Trahan, supra.
Even if this court were to determine that the expert testimony should not have been allowed, this issue would be subject to a harmless error analysis. State v. Code, supra. Under the proper analysis, it cannot be said that the guilty verdict rendered in this trial was surely attributable to the alleged error. State v. Code, supra; State v. Trahan, supra. Thus, any alleged error here was not reversible.
This assignment is without merit.
Assignment of Error Number Three (verbatim): The trial court erred in refusing to order a drug analysis of the victim's blood.
The defense notes that it made a pretrial motion to test the victim's body fluids for illicit drugs, which was denied as irrelevant towards the issue of guilt. The defendant points out that the coroner collected, but did not test, the victim's body fluids. He asserts that the failure of the trial court to order this test violated his rights of confrontation and due process. He argues that, by denying his request, he was prevented the opportunity to present another reasonable hypothesis and motive for the crimethat the victim was at Parkview Apartments to purchase illegal drugs.

Applicable law:
Both the federal and state constitutions guarantee the right of a defendant to confront his accusers. U.S. Const. amend. VI; La. Const. art. 1, § 16 (1974). "Confrontation" means a face-to-face meeting between witness and defendant. Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); State v. Phillips, 343 So.2d 1047 (La.1977). The right, however, is not absolute. State v. Ranker, 359 So.2d 129 (La.1978). It is subject to the inherent *160 power of courts to conduct criminal proceedings in a dignified, orderly and expeditious manner. La.C.Cr.P. art. 17; Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), State v. Roberts, 541 So.2d 961 (La.App. 2d Cir.1989). The violation of defendant's right to confrontation may be harmless error, State v. Murphy, 542 So.2d 1373 (La.1989), and is to be analyzed by assuming that the damaging potential of the trial court's refusal to allow a "face-to-face" confrontation was fully realized, then asking whether the reviewing court may conclude that the error was nevertheless harmless beyond a reasonable doubt. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Also See State v. Code, 627 So.2d 1373, 1384 (La.1993) (noting that before a reviewing court declares an error harmless beyond a reasonable doubt, it must find that the verdict "actually rendered in this trial was surely unattributable to the error"). State v. Welch, 99-1283 (La.4/11/00), 760 So.2d 317. Further, the Supreme Court held that where the evidence sought to be admitted is not relevant, the right to confrontation is not affected. State v. Vaughn, 448 So.2d 1260 (La.1983); State v. Womack, 592 So.2d 872 (La.App.2d Cir.1991).
There is no general constitutional right to discovery in a criminal case. State v. Hennis, 98-0664 (La.App. 1st Cir.2/19/99), 734 So.2d 16, writ denied, 99-0806 (La.7/02/99), 747 So.2d 16. In State v. Wilson, 28,403 (La.App.2d Cir.8/21/96), 679 So.2d 963, this court dealt with a claim regarding a similar defense motion. The trial court denied the motion, finding the urine test would be irrelevant in that it would not show the victim was using cocaine at the time of the offenses. In brief, that defendant urged that this ruling deprived him of his constitutional right to present a defense. This court held:
Relevant evidence is that tending to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. Like the District Court, we do not see how the proposed test, which could detect cocaine in the victim's system for only 24 hours, could possibly prove her condition nearly six months earlier.
This court further noted that courts are generally reluctant to order the victims of sex crimes to submit to further examinations, and found no need to depart from the general practice.

Application of law to facts:
Although the defendant correctly notes his right to confront the witnesses against him, he does not cite any law that authorizes him to compel the state to run blood tests on the deceased victim in enforcement of this right to confrontation.
The defendant has failed to show that the proposed test was relevant. That is, the defendant could prove the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the requested scientific evidence. Even positive results from a drug test performed on the victim's blood would not have made it more or less probable that the defendant committed the offense. Also, any "motive" for the crime that the drug test might have proved, such as a drug-related murder, would not have excluded the defendant as an assailant. Since the evidence sought to be admitted was not relevant, the right to confrontation was not affected. State v. Vaughn, supra; State v. Womack, supra. Thus, the trial court did not err in denying the defendant's pre-trial motion to test the victim's body fluids for illicit drugs.
*161 This assignment of error is without merit.

ERROR PATENT
Error patent review disclosed that the trial court failed to inform the defendant, who is now advised by this court's opinion, that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of LSA-C.Cr.P. arts. 914 or 922. The Louisiana Supreme Court has held that LSA-C.Cr.P. art. 930.8(C), which requires the trial court to inform the defendant of the limitations period for filing an application for postconviction relief, is supplicatory language and does not bestow an enforceable right upon an individual defendant. State ex rel Glover v. State, 93-2330 (La.9/5/95), 660 So.2d 1189.

CONCLUSION
For the above reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
APPLICATION FOR REHEARING
Before NORRIS, C.J., WILLIAMS, STEWART, KOSTELKA, and DREW, JJ.
Rehearing denied.
NOTES
[1] The second subsection of the second degree murder statute includes a killing without intent when the offender is engaged in enumerated felonies. Since the facts support a finding of second degree murder under the intent to kill or inflict great bodily harm portion of the statute, we pretermit any discussion of the felony-murder subsection.